[No. B226848. Second Dist., Div. One. Oct. 12, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
RICARDO VALENZUELA, Defendant and Appellant.

## COUNSEL

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Eric E. Reynolds and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—A jury convicted Ricardo Valenzuela of five counts of attempted murder, one count of second degree murder, and three counts of shooting at an occupied motor vehicle, and found true related firearm and gang allegations. The court sentenced Valenzuela to 230 years to life in prison. Valenzuela appeals, claiming instructional and other error. We order the judgment modified but affirm in all other respects.

## BACKGROUND

An information filed December 14, 2009, charged Valenzuela with five counts of attempted willful, deliberate, and premeditated murder in violation of Penal Code[1] sections 187, subdivision (a), and 664 (counts 1, 2, 3, 5, and 6), and one count of willful, deliberate, and premeditated murder of Ezekiel Gonzalez, in violation of sections 187, subdivision (a) and 664 (count 4).

The information also alleged that as to counts 1, 2, and 3 Valenzuela personally and intentionally discharged and used a handgun, in violation of section 12022.53, subdivisions (b) and (c). As to counts 4 and 5, the information alleged that a principal personally used (§ 12022.53, subds. (b), (e)) and personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)), which proximately caused great bodily injury and death to the victim (§ 12022.53, subds. (d), (e)(1)). As to count 6, the information alleged that a

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

principal personally used (§ 12022.53, subds. (b), (e)(1)) and personally and intentionally discharged a firearm (§ 12022.53, subds. (c), (e)(1)). The information alleged that the attempted murder counts (counts 1, 2, 3, 5, and 6) were committed willfully, deliberately, and with premeditation, in violation of section 664, subdivision (a). The information also alleged that the attempted murder and murder charged in counts 1 through 6 were committed for the benefit of a street gang, in violation of section 186.22, subdivision (b)(4).

Valenzuela pleaded not guilty and denied the special allegations. During trial, on a motion by respondent, the information was amended by interlineations to add three counts of shooting at an occupied vehicle, in violation of section 246 (counts 7–9) with related allegations of personal firearm use (§ 12022.5) and gang allegations (§ 186.22, subd. (b)(4)). The information was also amended to add the allegation to count 6 that a principal personally and intentionally discharged a handgun, causing great bodily injury and death to the victim. (§ 12022.53, subds. (d), (e)(1).)

The jury found Valenzuela guilty of the second degree murder of Ezekiel Gonzalez (count 4) and guilty as charged on all other counts, and found true all the enhancement allegations. On July 26, 2010, the trial court sentenced Valenzuela to a term of 230 years to life in prison, staying under section 654 the sentences for the three counts of shooting at an occupied vehicle. Valenzuela filed a timely appeal.

## FACTS

Valenzuela argues that several instructions were not supported by substantial evidence, and we therefore describe the evidence in some detail.

### I. *Prosecution case*

At trial, the prosecution's first witness was Anubia Gonzalez, the sister of Ezekiel Gonzalez, the murder victim.[2] Anubia testified that in 2004, when she was 15, she "jumped in" to Trust No Bitch (TNB), fighting a TNB member as her initiation. TNB had around 20 members, and Roger Martinez was their leader. TNB's territory was in Palmdale. When Anubia joined, she believed

---

[2] For ease of reference and to distinguish Anubia from her late brother Ezekiel Gonzalez, we refer to Anubia Gonzalez as Anubia and Ezekiel Gonzalez as Gonzalez. No disrespect is intended.

TNB was a "tagging crew," but she later learned that TNB also stole cars and fought with rivals or anyone who disrespected them, and "wanted to be a gang." Anubia "jumped out" of TNB in February 2005 by fighting two TNB members. She left because a TNB member had attacked a friend of hers whose brother was a member of Young Boys Rifa (YBR). Anubia had seen photographs of TNB members, including Martinez, with firearms.

The area Anubia lived in was YBR territory. Anubia had heard rumors that her brother Gonzalez was a YBR member, and she knew for sure in April 2006, when Anubia saw YBR tattoos on Gonzalez's hand and the back of his head. In May 2006, Anubia was at a swap meet with Gonzalez, when she approached a former boyfriend and TNB member and asked him whether TNB and YBR were "bumping heads." The former boyfriend's sister attacked Anubia, telling her to go ahead and "[s]ay fuck T-N-B and watch what's going to happen." The two women pushed each other and began to fight, and Anubia's former boyfriend kicked her. Gonzalez told him to stop, and the fight ended.

A. *The May 6, 2006 shooting (attempted murder; counts 1, 2, and 3)*

Oscar Flores testified that he was Gonzalez's brother-in-law, and knew that Gonzalez was a YBR gang member with gang tattoos on his body. Flores was not a gang member. On May 6, 2006, Flores was driving home in his fiancée's Nissan Sentra, with Gonzalez in the passenger seat and someone called "Socko" in the backseat. It was dark out. As Flores pulled out of a gas station, he heard a gun go off and saw his car window shatter. Flores could not remember how many shots he heard. Flores saw a white Ford Festiva on his right-hand side, with a "Jesus Malverde" sticker in the back window. Flores looked over and saw one person, Valenzuela, in the Festiva. Valenzuela had shouted "T-N-B" before the shooting. Flores did not know Valenzuela, but Gonzalez knew him and said he was from TNB and his nickname was "Snaps."

Flores inspected the Sentra afterward and noticed bullet holes in the headrest on the passenger side, near the handle on the front passenger door, and near the handle on the rear passenger door. The passenger side windows were shattered, and Flores found a bullet lodged in the front passenger headrest, where Gonzalez had been sitting. Flores did not report the incident because he was worried that he would be labeled a "snitch." He filled the bullet hole in the front passenger door the next day.

### B. The July 10, 2006 shooting (murder; count 4; and attempted murder, counts 5 and 6)

Flores testified that after dark on July 10, 2006, after playing handball with Gonzalez and someone called "Smokes"[3] at McAdam Park, he drove off in the Sentra, with Gonzalez in the passenger seat and Smokes in the backseat. Flores noticed the same white Festiva. Gonzalez suggested he follow, and Flores started after the Festiva.[4] Flores's intention was to talk to whoever had shot at him earlier and tell him he did not want any problems, although Gonzalez wanted to beat the Festiva driver up. Flores followed about three lengths behind the Festiva through two traffic lights, driving under the speed limit. When the Festiva made a left turn onto a two-lane highway, Flores noticed that the driver was using a cell phone. There was another person in the Festiva.

Flores then noticed a black car (later determined to be a green Dodge Stratus, belonging to Roger Martinez) on his side of the car, on the wrong side of the road, and saw one person in the car. The driver of the Dodge lowered the passenger side window, raised a gun, and started firing multiple shots at Flores's Sentra. Flores ducked down, and Gonzalez fired back at the Dodge. At the same time, the Festiva moved next to the Sentra's passenger side on the shoulder of the highway, and Valenzuela, the driver of the Festiva, also fired at the Sentra.[5] At some point, Flores's Sentra hit the back of the Festiva. Flores's left arm was struck by a bullet which he was sure came from Martinez's Dodge.

Flores crashed the Sentra into an oncoming car. When he came to, he saw that the Sentra was on fire and got out of the car. Seeing that Gonzalez was not moving, he asked people to help get him out, and someone pulled a bleeding Gonzalez from the burning Sentra. Flores and Smokes ran five feet away from the car.

Los Angeles County Sheriff's Deputy Douglas Parkhurst testified that he arrived on the scene at 10:33 p.m. The Sentra was in flames, and a black vehicle it had collided with was at the corner. The Festiva was abandoned about 200 to 250 yards away. Gonzalez was lying on the sidewalk with a gunshot wound, and paramedics pronounced him dead.

---

[3] "Smokes" was Ivan Sanchez, a YBR member.

[4] At trial, counsel also referred to the car as a Ford Fiesta.

[5] Flores had identified Valenzuela as the shooter in a six-pack photo identification.

Los Angeles County Sheriff's Detective Jonas Shipe testified that he arrived on the scene at 1:05 a.m. A .38-caliber bullet casing was found north of the collision scene on the highway. A gun (a Walther PPK) was recovered from the Sentra's front dashboard area. On the driver's side of the Sentra, there was a bullet hole in the side view mirror, a strike to the frame of the door, and a strike to the keyhole of the door. A bullet fragment was recovered from the door.

From the Dodge, police recovered a bullet that matched the Walther PPK recovered from the Sentra. The other two bullets—the fragment in the door of the Sentra, and the casing found in the street—were not fired by the Walther PPK. When interviewed, Flores said "Snaps" was the person involved, and identified Valenzuela as a suspect in a six-pack photo identification.

Flores was initially arrested and booked for murder. On July 12, 2006, he told Detective Shipe that he did not follow the Festiva, and that the Festiva hit the Sentra from behind. He denied having seen the Festiva before, and said he did not know how he got shot. Flores also said that he saw that Gonzalez had a gun in his work boot, before he saw the Festiva or the Dodge. After the police showed him a photo of Gonzalez lying dead, Flores said he knew where "Snaps" lived, showed Detective Shipe where the house was, and identified the Festiva, stating that he had seen it parked outside Valenzuela's house.

C. *July 18, 2006 arrest of Valenzuela and interview in custody*

Detective Shipe arrested Valenzuela on July 18, 2006. Valenzuela was leaving his house in the backseat of a car. Detective Shipe recovered a loaded .22-caliber pistol, wrapped in a shirt, from the storage compartment of the driver's seat, in front of where Valenzuela was sitting. A search of Valenzuela's house found shotgun shells, .22-caliber rounds, a bandanna, and in Valenzuela's room, notebooks with "TNB" written on them.

A tape-recorded interview of Valenzuela that same day with Detectives Shipe and David Carver was played for the jury at trial. Valenzuela stated that he had a TNB tattoo from two or three years earlier, and his nickname was "Snaps" because he used to have an anger management problem. He was 18 years old. When asked when he had "jumped in" to TNB he replied that he was 15 or 16, but was no longer a TNB member. He admitted that about two weeks ago on the streets, he acquired the gun found in the car storage compartment at the time of his arrest. He owned the ammunition found in his

room. Sometimes Valenzuela borrowed his mother's Festiva, which had a Malverde sticker on it. He took the car without telling his mother on July 10, 2006, and was at the house of his friend "Puppet." Valenzuela then said he did not want to answer any more questions, and the interview ended.

Detective Shipe testified that Valenzuela called the detectives back to talk more. Detective Shipe mistakenly believed he had started the tape recorder when the second interview began, but he hit the wrong button and the interview was not recorded. Valenzuela told the detectives that he saw rival gang members and fired the shots at Flores's Sentra in May 2006, but he never stated that he saw a gun, that someone in the Sentra shot at him first, or that he was fearful. At some point, Valenzuela said that someone in the other car was reaching for a firearm.

### D. *Interview August 16, 2006*

Detective Shipe interviewed Valenzuela again on August 16, 2006. The recording of the interview was played for the jury. Valenzuela told Detective Shipe that in the May 2006 shooting, he was in the Festiva when he heard gunshots. There were three people in the other car when it pulled up on him, and they were screaming at him and saying "YBR," and he thought they were going to jump out of their car. They tried to box Valenzuela in, one of them had the front passenger door open, one had something in his hand, and Valenzuela heard shots. Valenzuela fired back because he feared for his life, and then drove away and lost the other car.

During the July 10, 2006 shooting, Valenzuela heard gunshots and got hit from behind, and ran from his car when it stopped. The other car was the same car as in the May 2006 incident. Detective Shipe urged Valenzuela to tell him the truth so that authorities could "decide whether it[] [was] . . . self defense, or if [Valenzuela had] some kind of culpability in this." Valenzuela told Detective Shipe that he was heading home with his friend "Puppet," whose real name was Jose Lara (although Valenzuela first said that his name was Roberto), when someone recognized his Festiva and started following him. He said he could not remember whom he called, and he did not know who was in the other car. Detective Shipe told him he had his phone records and knew the phone number. Valenzuela said he had nothing to say, and did not know whom he called.

### E. *Cell phone records*

Martinez's and Valenzuela's cell phone records for July 10, 2006, showed that they exchanged several cell phone calls between 6:15 p.m. and 8:33 p.m., and Valenzuela called Martinez three separate times just minutes before

Deputy Parkhurst arrived at the scene around 10:33 p.m.: at 10:23 p.m., 10:28 p.m., and 10:30 p.m. After the shooting, Valenzuela called Martinez multiple times: at 10:36, 10:38, 10:40, 10:46, 11:16, 11:19, and 11:51 p.m.

### F. *Interviews and testimony of Martinez*

Detectives Shipe and Carver interviewed Martinez on August 24, 2006, and the videotape of the interview was played for the jury. Martinez, then 19 years old, stated that he knew Valenzuela, whose nickname was "Snaps."[6] Martinez used to be from TNB, and his nickname was "Cynic." On the night of July 10, 2006, Martinez was driving to Valenzuela's house in a green Dodge when Ricardo "called me, told me, 'Hey, some guys are following.' So, and all of a sudden, the phone cut off." Martinez tried calling back but got no answer. Martinez drove to Valenzuela's house, but he was not there. Valenzuela called Martinez and asked him to pick him up because something had just happened. Martinez refused, and Valenzuela arrived home running, telling Martinez, "Some guys, um, following me and then just got into it [shooting]."

After the detectives showed Martinez the cell phone records, he explained that Valenzuela kept calling him to ask him for a ride, and denied that he drove on the highway that night. Martinez then said he picked Valenzuela up, and that he had seen Valenzuela driving the Festiva and crashing into the car that followed him. The car following the Festiva crashed into a black car and something blew up. Martinez, who was alone in the car, drove to his cousin's house and picked up Valenzuela after he called while he was running from the scene.

The detectives described a surveillance video that showed Martinez's Dodge driving next to the Sentra with three people inside, and "bright flashes of light" coming from the Dodge. Martinez then stated that Valenzuela called him and told him to "get a strap," or gun. Martinez and his passenger, a TNB member known as "Largo,"[7] picked up a .38-caliber handgun after Valenzuela called Martinez. Valenzuela called again with his location.

Martinez saw Valenzuela's car being followed by another car, and Martinez pulled up on the side of the following car because Largo told him to get closer. Largo, lying back in the passenger seat, fired three or four rounds, and the people in the following car looked surprised. Martinez thought they fired back because he found bullet holes in his car, but he did not know where the

---

[6] Pursuant to a search warrant for Martinez's residence, detectives found a letter addressed to Martinez from Valenzuela dated October 2005, in which Valenzuela used his nickname "Snaps" and crossed out the letters "D" and "Y" as disrespect to another gang and YBR.

[7] Martinez gave Largo's real name as Victor Flores, but detectives were not able to find him.

bullets came from. The other car kept following Valenzuela's car, hitting it and then crashing into a fourth car after Martinez's car had passed. Martinez did not see the crash. He dropped Largo off, and Largo took the gun with him. Martinez picked Valenzuela up as he ran, and dropped Valenzuela off at his house.

Another interview of Martinez on September 18, 2006, was tape-recorded and played for the jury at trial. Martinez told the detectives that on July 10, 2006, he was with Largo swimming when Valenzuela called saying that he was being followed. Valenzuela asked Martinez to get a strap, and Martinez and Largo picked up the gun. Valenzuela called again to give his location, and Martinez drove there and pulled up on the driver's side of the car following Valenzuela. Largo fired at the car and the car returned fire.

Martinez was convicted of the first degree murder of Gonzalez and the attempted premeditated murders of Flores and Sanchez (Smokes).[8] At Valenzuela's trial, Martinez testified that he had been close friends with Valenzuela in high school. Martinez denied ever hearing of TNB or making any incriminating statements to detectives.

### G. Gang expert testimony

Los Angeles County Sheriff's Deputy Joseph Fender, a gang expert, testified that TNB was a gang that began as a tagging crew, and in 2006 TNB had 20 to 30 members and primarily engaged in vehicle theft. Martinez had told Deputy Fender that he was a TNB member. Valenzuela had admitted that he was a TNB member with the nickname "Snaps," and Deputy Fender had seen " 'Trust No Bitch' " tattooed on Valenzuela's chest. In 2006, TNB and YBR claimed the same territory. Given a hypothetical with facts similar to those in this case, Deputy Fender opined that the May 2006 and July 2006 shootings were committed for the benefit of a gang.

## II. Defense case

### A. Valenzuela's testimony

Valenzuela testified on his own behalf. He became a member of TNB in 2004 and left the gang in early 2006, although he still hung around with some TNB members, including Martinez. He denied that he was ever jumped in, stating that he was just a member.

---

[8] In a nonpublished opinion, this court affirmed Martinez's conviction of first degree murder and use of a firearm causing great bodily injury or death. (*People v. Martinez* (Dec. 23, 2009, B209939) [nonpub. opn.].)

Valenzuela admitted that in May 2006, he shot at the Sentra with three people inside. The Sentra followed his car when he was leaving home. He heard the Sentra's occupants scream something out ("where you from, or fuck TNB, or something" or "YBR Young Boys"), the passenger moved as if he had a gun, and Valenzuela heard a popping sound. When the Sentra tried to block him off Valenzuela saw the passenger start to open the door with a black object in his hand, and Valenzuela fired out of his driver's side window at the passenger side of the car. He aimed at the side of the car, not at the occupants. Valenzuela bought the gun on the street a few weeks earlier, although he knew it violated his probation to do so, and he carried the gun for protection. He shot at the Sentra because "I thought they were going to keep shooting; so I had a gun too, so I shot too. [¶] . . . [¶] . . . I thought I was going to get shot and probably killed." He shot at the car to try to get away. Before May 6, 2006, he had never fired a gun.

On July 10, 2006, Valenzuela was driving home with Puppet when he noticed the Sentra from the May 6, 2006 shooting incident, parked near his house. He could not see who was inside. He passed the Sentra and drove away without stopping at his house, and noticed the Sentra's lights turn on. When he realized the Sentra was following him, Valenzuela sped up to 60 or 65 miles per hour, and at some point he was going 75 miles per hour and running red lights. The Sentra continued to follow him. He was scared and paranoid because Puppet told him "he's got a gun, he's got a gun," but Valenzuela never saw a gun. He called Martinez several times during the chase because he feared for his life, and told Martinez to get a gun and come help him, but Valenzuela did not tell Martinez to kill anyone. He did not have his gun with him that night. Valenzuela thought the chase lasted more than five minutes.

Valenzuela saw Martinez coming as he turned onto the highway. He heard gunfire, and then the Sentra hit his Festiva from behind. The Festiva was disabled, and Valenzuela abandoned it by the side of the road and ran to get away. He and Puppet ran away through the desert, and Valenzuela called Martinez a few more times to get picked up, but Martinez did not come. Valenzuela called his sister and she picked him and Puppet up. Valenzuela did not call the police about the shooting. He found out the next day that someone had been killed.

Valenzuela testified that he did not know that the detectives were recording his first interview after his arrest (for a probation violation). Detective Shipe was putting words in his mouth, Valenzuela got angry, and then Detective Shipe got angry and walked out. Valenzuela was interviewed again a month later. He admitted lying to the detectives about whether Martinez had a gun and when he said that he did not know who was in the dark car.

After his release from custody, Valenzuela went to Mexico to stay with his grandmother, who had cancer.[9] After a year, his girlfriend came to Mexico and he lived with her for another eight months. While he was in Mexico he visited the United States several times. He came back to the United States with his girlfriend when she got pregnant. He did not think he was wanted for any crimes.

## B.  *Other testimony*

Los Angeles County Sheriff's Detective Anthony Delia testified that he interviewed Oscar Flores about the May 2006 shooting. Flores told him that a person in a white Festiva pulled alongside of him, pointed a gun at him, and fired the gun at him, leaving three bullet holes in Flores's car.

Valenzuela's sister, Sonia Zabala, testified that Valenzuela called her around midnight on July 10, 2006, and asked her to pick him and a friend up. She picked Valenzuela and Puppet up, and Valenzuela told her he had been chased by a car which hit him from behind, and his car stopped working.

## III.  *Stipulations*

The parties stipulated that a firearms identification investigator would have testified that the Sentra had five bullet holes. The trajectory of the hole in the driver's side mirror could not be definitively determined, although it either traveled from outside the vehicle through the mirror housing toward the steering wheel, or from the inside through the mirror housing. The bullet causing the hole in the molding on the bottom edge of the driver's door window frame traveled from right to left, and no further trajectory could be determined. The bullet that created the hole in the exterior driver's door next to the handle traveled right to left and penetrated the exterior of the door; no further trajectory could be determined (a fired bullet was recovered from inside the door). The bullet impact to the rear door ricocheted off the exterior; no trajectory could be determined, and the impact was possibly historic. The bullet creating the bullet hole in the right front door traveled right to left and penetrated the exterior; no further trajectory could be determined, and the bullet hole was possibly historic. The parties also stipulated to the admission of the coroner's report of Gonzalez's autopsy, which showed that the entrance wound was a "through and through" bullet wound on the left front collarbone, and the exit wound was on Gonzalez's left back. The cause of death was a gunshot wound that severed the aorta, causing massive blood loss.

---

[9] In rebuttal, Detective Fender testified that just after Valenzuela was charged with murder, Valenzuela's brother told Detective Fender that Valenzuela had gone to Canada. Detective Fender looked for Valenzuela three or four times a week for the next two and a half or three years. A week before the July 10 shooting, Detective Fender made a traffic stop of a green van in which Valenzuela was a passenger. The driver said he was a TNB member.

## DISCUSSION

I. *The trial court did not have a sua sponte duty to give an instruction on imperfect self-defense.*

Valenzuela argues that the trial court had a duty to instruct the jury sua sponte on imperfect self-defense. We disagree.

During a conference on jury instructions, the trial court told counsel that although "I don't believe that the defendant's testimony laid a foundation for self-defense in this case as to either shooting," the court would nevertheless give an instruction on self-defense. The court continued: "However, I do not intend to instruct on the theory of imperfect self-defense. I don't think under any stretch of the imagination if the jury found that the defendant was in actual fear of death or great bodily injury, then under the circumstances where he alleged that the victims have [a] gun, that would be unreasonable." There was no objection from the defense. Shortly thereafter, the court asked defense counsel if she had any instructions she wished to add to those the court intended to give, and she answered no. The court gave a self-defense instruction, but no instruction on imperfect self-defense.

█ "To be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend. [Citations.] A bare fear is not enough; 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.' [Citation.]" (*People v. Flannel* (1979) 25 Cal.3d 668, 674–675 [160 Cal.Rptr. 84, 603 P.2d 1], superseded by statute on another point as stated in *In re Christian S.* (1994) 7 Cal.4th 768, 777 [30 Cal.Rptr.2d 33, 872 P.2d 574].) In contrast, "[i]mperfect self-defense is the killing of another human being under the actual but *unreasonable* belief that the killer was in imminent danger of death or great bodily injury. [Citation.] Such a killing is deemed to be without malice and thus cannot be murder. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 182 [119 Cal.Rptr.3d 722, 245 P.3d 366], italics added.) "We caution, however, that the doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense." (*In re Christian S.*, at p. 783.)

█ The court's duty to instruct on voluntary manslaughter under an imperfect self-defense theory arises " 'whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 883 [48 Cal.Rptr.3d 1, 141 P.3d 135].) "In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of

the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541 [98 Cal.Rptr.3d 113, 213 P.3d 652].) Substantial evidence is not " ' "*any* evidence, no matter how weak," ' " but evidence from which a reasonable jury could conclude that the defendant was guilty only of manslaughter. (*Id.* at p. 553.)

We agree with the trial court that substantial evidence did not support an imperfect self-defense instruction for either the May 6, 2006 or the July 10, 2006 shooting. Valenzuela testified that on May 6, 2006, he shot at the Sentra after the Sentra followed his Festiva, the occupants screamed out "fuck TNB" or "YBR," the passenger moved as if he had a gun, and Valenzuela heard a popping sound. The Sentra tried to block Valenzuela off, and Valenzuela saw the passenger start to open the Sentra door with a black object in his hand. Valenzuela fired at the passenger side of the Sentra, because he "thought they were going to keep shooting; so [he] had a gun too, so [he] shot too. [¶] . . . [¶] [He] thought [he] was going to get shot and probably killed." This testimony is substantial evidence that Valenzuela had an actual belief that he was in imminent danger of death or great bodily injury.

It cannot be said, however, that if the jury credited Valenzuela's testimony, his actual belief that he was in imminent danger might also be deemed unreasonable. The Sentra was following him, the occupants shouted an insult to his gang and the name of a rival gang, Valenzuela heard a popping sound which he believed was shooting, and when the Sentra tried to block Valenzuela's car from moving, a passenger in the Sentra with a black object in his hand started to open the door. Other evidence at trial established that TNB and YBR were rival gangs. A court must instruct on imperfect self-defense only "when there is substantial evidence that the defendant killed in unreasonable self-defense." (*People v. Barton* (1995) 12 Cal.4th 186, 201 [47 Cal.Rptr.2d 569, 906 P.2d 531], fn. omitted.) A reasonable jury could not conclude that Valenzuela's actual fear of imminent death or great bodily injury was unreasonable.

Valenzuela testified that on July 10, 2006, he was driving home after dark in the Festiva with Puppet, when he saw the Sentra parked near his house. When Valenzuela changed course, the Sentra followed him at speeds up to 75 miles per hour and through red lights, for more than five minutes. Puppet told him, "he's got a gun, he's got a gun," although Valenzuela did not see one. Valenzuela called Martinez to get a gun and come help him. Martinez arrived and Valenzuela heard gunfire. The Sentra hit his Festiva, disabling the car, and Valenzuela ran. Again, Valenzuela's testimony was substantial evidence that he had an actual belief that he was in imminent danger of death or great bodily injury. The same Sentra that had followed him on May 6, 2006, and

tried to block him off after Valenzuela heard "popping," and whose passenger started to open the door with a black object in his hand which Valenzuela thought was a gun, was now, two months later, waiting near his home and pursuing him in a high-speed chase, during which his passenger told Valenzuela that someone in the Sentra had a gun. Valenzuela was so frightened that he called Martinez to get a gun and come help him.

While substantial evidence supported Valenzuela's actual belief in imminent danger on July 10, 2006, however, there was not substantial evidence that his belief was unreasonable. Valenzuela had already shot at the Sentra in a gang-related incident two months earlier. Valenzuela was "driving crazy" at speeds up to 75 miles per hour, with the Sentra on his tail and Valenzuela's passenger, Puppet, repeatedly telling him that someone in the Sentra had a gun. Puppet was not mistaken; Flores testified that Gonzalez fired a gun at Martinez's Dodge, and a Walther PPK handgun was found on the Sentra's front dashboard. No reasonable jury could conclude that Valenzuela's belief that he was in imminent danger of death or great bodily injury was unreasonable.

Valenzuela's claim was that he acted in self-defense in both incidents. He provided a detailed recounting of events in which he stated that on both nights, he believed (because he heard popping and saw a dark object on May 6, 2006, and because Puppet told him so on July 10, 2006) that someone in the Sentra had a gun. On July 10, 2006, Valenzuela was also pursued by the Sentra at high speeds, which eventually resulted in his being hit from behind, and before the collision he heard shooting. Especially given Valenzuela's testimony that on May 6 he heard his gang insulted and the name of a rival gang from the Festiva, and in the light of the jury's true finding on the gang allegation as to both shootings, no reasonable jury could conclude that it was unreasonable for Valenzuela to fear imminent death or great bodily injury on July 10, 2006.

■ Valenzuela argues that his testimony provided a factual basis on which a jury could conclude that his actual fear of death or great bodily injury was unreasonable. He points out that on May 6, 2006, he did not testify that he actually saw a gun pointed at him, and that his car was not entirely blocked off by the Sentra. He also testified, however, that he heard popping noises and, when he saw the dark object in the Sentra passenger's hand, he believed that the Sentra's occupants were going to keep shooting. Valenzuela also argues as to July 10, 2006, that the jury could have found his fear unreasonable because he called Martinez before any actual shooting occurred, based on Puppet's repeated assertion that someone in the Sentra had a gun. Valenzuela's belief that he was being pursued by rival gang members with a gun, however, need not have been definitively proven true,

by (for example) a clear view of an actual gun on May 6 or July 10, 2006. His belief must only have been reasonable, and there was no evidence that it was otherwise. To the contrary, Flores testified that Gonzalez shot a gun, and a gun was found on the Sentra's dashboard. "A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' [Citation.] But no principle of law required the trial judge below to disregard the evidence in order to find that the jury should consider" a theory not supported by the evidence. (*People v. Moye, supra*, 47 Cal.4th at p. 554.) This is especially true when, as in this case, "the evidence actually introduced on the point—the defendant's own testimony—was to the contrary." (*Ibid.*)

Valenzuela also argues that regardless of whether substantial evidence supported an imperfect self-defense theory, the trial court was required to instruct on imperfect self-defense. He argues that an imperfect self-defense instruction must always be given when the court gives an instruction on self-defense, and the evidence supports a conclusion that the defendant had an actual fear of imminent death or great bodily injury. In support, he cites *People v. De Leon* (1992) 10 Cal.App.4th 815 [12 Cal.Rptr.2d 825] (*De Leon*), in which the defendant argued that where a self-defense instruction was given, the trial court must have found substantial evidence of self-defense, and therefore "there was, *necessarily*, substantial evidence of *imperfect* self-defense." (*Id.* at p. 824.) The Court of Appeal responded: "It is hard to fault appellant's logic. If there was substantial evidence of his 'honest belief' for self-defense purposes, there was substantial evidence of his 'honest belief' for *imperfect* self-defense purposes." (*Ibid.*) The issue in the present case, however, is not whether there is substantial evidence of Valenzuela's *honest or actual belief* in imminent danger of death or great bodily injury. As detailed above, his testimony provided that evidence of his actual belief. The issue is rather whether there is substantial evidence that his belief was *reasonable*. The court in *De Leon* went on to hold that (unlike this case) there was not substantial evidence of the defendant's honest belief for *either* instruction (*ibid.*), and so that case does not stand for the proposition advanced by Valenzuela that *regardless* of the evidence, a court that gives a self-defense instruction must also instruct on imperfect self-defense.[10] Notably, in his concurrence, Justice Earl Johnson, Jr., urged that "had there been sufficient evidence to support the former [instruction on self-defense], it

---

[10] Unlike the defendant in *De Leon, supra*, 10 Cal.App.4th 815, who did not testify, Valenzuela testified at length regarding the events on each night. His testimony about what he heard and saw, if the jury chose to believe it, could only have supported a conclusion that he actually and *reasonably* believed that he was in imminent danger of death or great bodily injury on both occasions. His theory was that he acted in self-defense when he shot at the Sentra on May 6, 2006, and called Martinez to bring a gun on July 10, 2006.

would have been error to refuse to give the latter [instruction on imperfect self-defense]." (10 Cal.App.4th at p. 825 (conc. opn. of Johnson, J.).)

Valenzuela urges us to follow the approach of Justice Earl Johnson's subsequent concurrence in *People v. Ceja* (1994) 26 Cal.App.4th 78 [31 Cal.Rptr.2d 475] (*Ceja*),[11] in which the trial court gave an instruction on justifiable self-defense as a complete defense to murder, but rejected the defense's argument that voluntary manslaughter instructions under a theory of imperfect self-defense were required. (*Ceja*, at p. 85.) The concurring opinion referenced *De Leon, supra,* 10 Cal.App.4th 815 as requiring the conclusion that "if there is sufficient evidence of all the elements required to justify a perfect self-defense instruction, by definition there is sufficient evidence supporting an instruction for . . . imperfect self-defense." (*Ceja*, at p. 90 (conc. opn. of Johnson, J.).) As we explained above, however, only the concurrence in *De Leon* imposed such a requirement, and we have found no other California case doing so. (See *Ceja*, at p. 90 (conc. opn. of Johnson, J.) [acknowledging that "*De Leon* is the only California case I have found which clearly states this requirement . . ." & citing out-of-state cases].)

We agree instead that "just because a trial court instructs a jury on perfect self-defense, this does not necessarily mean it has a sua sponte duty to also instruct on *imperfect* self-defense." (*People v. Rodriguez* (1997) 53 Cal.App.4th 1250, 1254–1255 [62 Cal.Rptr.2d 345] (*Rodriguez*).) Rodriguez was charged with two homicides, including the murder of a victim named Moore with a knife. The jury found him guilty of the second degree murder of Moore. (*Id.* at p. 1255.) Although he had not requested an imperfect self-defense instruction as to Moore's killing, he argued on appeal that the trial court had a sua sponte duty to give the instruction. (*Id.* at p. 1271.) The Fifth Appellate District pointed out (as is also true in this case): "The *Ceja* case is distinguishable since the defendant requested the [imperfect self-defense] instruction whereas here, defendant did not." (*Rodriguez*, at p. 1273.) The court continued: "To the extent *De Leon* and/or *Ceja* suggest that imperfect self-defense instructions must be given whenever perfect self-defense instructions are warranted by the evidence, we disagree." (*Ibid.*)[12]

Imperfect self-defense is not a "true" defense, but a "shorthand description of one form of voluntary manslaughter." (*People v. Barton, supra,* 12 Cal.4th at p. 200.) "Accordingly, when a defendant is charged with murder

---

[11] *People v. Ceja, supra,* 26 Cal.App.4th 78 was disapproved on other grounds in *People v. Blakeley* (2000) 23 Cal.4th 82, 92 [96 Cal.Rptr.2d 451, 999 P.2d 675].

[12] We note that here, as in *Rodriguez, supra,* 53 Cal.App.4th at page 1272, the trial court did give an instruction on voluntary manslaughter (including heat of passion and provocation). Valenzuela therefore was not denied an instruction on the lesser included offense of voluntary manslaughter.

the trial court's duty to instruct sua sponte, or on its own initiative, on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense . . . ." (*Id.* at p. 201.) "[W]e have never intimated that the rule is satisfied once the jury has *some* lesser offense option, so that the court may limit its sua sponte instructions to those offenses or theories that seem strongest on the evidence, or on which the parties have openly relied. On the contrary, . . . [t]he inference is that *every* lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*People v. Breverman* (1998) 19 Cal.4th 142, 155 [77 Cal.Rptr.2d 870, 960 P.2d 1094]). "This does not mean, however, that trial courts must instruct sua sponte on unreasonable self-defense in every murder case. Rather, the need to do so arises only where there is substantial evidence that the defendant killed in unreasonable self-defense, not when the evidence is 'minimal and insubstantial.' [Citation.]" (*People v. Barton, supra,* 12 Cal.4th at p. 201, fn. omitted.)

█ "Where, as here, the defendant's version of events, if believed, establishes actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the instruction. [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834 [74 Cal.Rptr.3d 416].) Valenzuela's testimony, if the jury believed him, could only lead to a conclusion that he acted in justifiable self-defense on both occasions, not to a conclusion that he acted in imperfect self-defense. If the jury believed the prosecution's theory (that Valenzuela, unprovoked, shot at the Sentra on May 6, 2006, after yelling out "TNB," with the intent to kill the occupants, and that on July 10, 2006, he "set up an ambush that night" and either shot at the Sentra, or aided and abetted Martinez in the murder and attempted murders), it is inconceivable that they would conclude Valenzuela actually believed he needed to defend himself on either occasion.

The trial court was not required to give a sua sponte instruction on imperfect self-defense.

## II.   *The trial court did not err by instructing the jury on mutual combat.*

Valenzuela argues that the trial court erred when it gave an instruction on mutual combat as it relates to self-defense, since there was no substantial evidence of mutual combat. The trial court gave the following instruction: "The right of self-defense is only available to a person who engages in mutual combat: [¶] 1. If he has done all the following: [¶] A. he has actually tried, in good faith, to refuse to continue fighting; [¶] B. he has by words or conduct caused his opponent to be aware, as a reasonable person, that he wants to stop fighting; and [¶] C. he has caused by words or conduct his

opponent to be aware, as a reasonable person, that he has stopped fighting; and [¶] D. he has given his opponent the opportunity to stop fighting. [¶] After he has done these four things, he has the right to self-defense if his opponent continues to fight. [¶] Mutual combat consists of fighting by mutual intention, agreement, or consent. It follows an express or implied agreement to fight. However before mutual combat can be found to exist, you must find that both combatants actually intended, agreed, or consented to fight before the claimed occasion for self-defense arose. The agreement need not have all the characteristics of a legally binding contract."

Counsel for Valenzuela asked about the rationale for the instruction, but did not object. During the discussion of the instructions, the court asked whether counsel had any objections, and defense counsel stated: "I . . . had a question about CALJIC 5.56, participants in mutual combat. Was there any evidence that would, you know, justify that? I didn't hear any evidence that indicated there was any allegation there was any mutual combat." The trial court responded that there was substantial evidence of mutual combat, since "it's a theory that can be argued to the jury from both sides. Here, you have a car full of Y-B-R gang members and a car full of T-N-B gang members. The allegation is that there have been multiple altercations. . . . I'm tasked with basically instructing on anything [for] which there's substantial evidence . . . before the jury at this point." Defense counsel, apparently satisfied, replied "Okay."

"Normally, a defendant forfeits the right to appeal alleged errors ' "by failing to make an appropriate objection in the trial court; however, an appellate court may review any instruction given even though no objection was made in the lower court if the substantial rights of the defendant are affected. [Citation.] The cases equate 'substantial rights' with reversible error, i.e., did the error result in a *miscarriage of justice*? [Citations.]" [Citation.]' [Citation.]" (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426–427 [40 Cal.Rptr.3d 615].) "Generally, ' " '[a] party may not complain on appeal that an instruction *correct in law* and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " ' [Citations.]" (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 849 [128 Cal.Rptr.3d 565].) Valenzuela does not argue that the instruction was incorrect in law. He argues instead that there was not substantial evidence that he engaged in mutual combat, "a violent confrontation conducted pursuant to prearrangement, mutual consent, or an express or implied agreement to fight." (*People v. Ross* (2007) 155 Cal.App.4th 1033, 1036 [66 Cal.Rptr.3d 438].)

█ There was substantial evidence of mutual combat on July 10, 2006. Flores testified that he followed Valenzuela's Festiva because of the May 6,

2006 confrontation (and Gonzalez, Flores's passenger in the Sentra's front seat, wanted to beat Valenzuela up). Gonzalez exchanged gunfire with Martinez when Martinez pulled up next to the driver's side of the Sentra, and Valenzuela fired at the Sentra from the passenger side. Valenzuela testified that he recognized the Sentra from May 6, 2006, the Sentra followed him for more than five minutes, and he called Martinez to come get a gun and help him. The Sentra followed Valenzuela, and Valenzuela arranged for Martinez to come and engage in a shoot-out with the Sentra. This was evidence from which a jury could conclude that the parties engaged in mutual combat, " 'the branch of the law of self-defense relating to homicides committed in the course of *a duel or other fight begun or continued by mutual consent or agreement, express or implied.* [Citations.]' " (*People v. Ross, supra*, 155 Cal.App.4th at p. 1045.)[13]

In any event, any error in the trial court's instruction was harmless, since Valenzuela would not have achieved a more favorable result had the instruction not been given. (See *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Under *Watson*, our review "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*People v. Breverman, supra*, 19 Cal.4th at p. 177.) The evidence supporting the existing judgment is strong in comparison to the evidence supporting Valenzuela's self-defense claim, and so there is no reasonable probability that the giving of the mutual combat instruction affected the result. (*Ibid.*)

We also reject Valenzuela's claim that his trial counsel was ineffective for failing to object to the mutual combat instruction. As we state above, the instruction was supported by substantial evidence of mutual combat. As the court would properly have denied any defense objection, Valenzuela was not prejudiced by the failure to object. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 104 S.Ct. 2052]; *In re Fields* (1990) 51 Cal.3d 1063, 1079 [275 Cal.Rptr. 384, 800 P.2d 862].)

III. *The trial court did not err by instructing on compelling another to commit a crime.*

Valenzuela argues that the trial court erred when it gave an instruction on compelling another to commit a crime. The court gave the following instruction: "A person who, by threat, menace, command or coercion, compels

---

[13] The court noted that "[d]etermining what constitutes mutual combat in the setting of a gang battle or war may present unique difficulties." (*People v. Ross, supra*, 155 Cal.App.4th at p. 1046, fn. 16.) In this case, the preexisting rivalry between TNB and YBR and the May 2006 incident in which Valenzuela fired at the Sentra are factors supporting our conclusion that the court did not err in giving the mutual combat instruction.

another to commit any crime is guilty of that crime." Again, counsel for Valenzuela did not object, instead stating that she "wondered about" the instruction. The trial court replied that there was evidence allowing a reasonable inference that Valenzuela "upon seeing the people that he had shot at before called someone else and said get a strap and basically come and take them out." Counsel replied: "Okay." Counsel's assent to the instruction forfeits Valenzuela's claim of instructional error unless he can show that the instruction affected his substantial rights, by demonstrating a miscarriage of justice. (*People v. Christopher, supra,* 137 Cal.App.4th at pp. 426–427.)

■ The challenged instruction conformed to section 31, which defines principals to a crime as including those "who, by threats, menaces, command, or coercion, compel another to commit any crime."[14] Valenzuela argues that the instruction may only be given when the other person is an "innocent conduit," citing *People v. Hernandez* (1971) 18 Cal.App.3d 651 [96 Cal.Rptr. 71]. The court in that case simply concluded that there was substantial evidence to convict the defendant as a principal under section 31 (when the trial court gave a similar instruction to the instruction of which Valenzuela complains) when she compelled (using a firearm) an "innocent conduit" to commit the crime. (18 Cal.App.3d at pp. 655, 657.) This certainly does not *limit* the application of section 31 to a principal who compels an entirely innocent person to commit a crime, and Valenzuela cites no authority which so interprets the statute.

In this case, there was substantial evidence to support the instruction where Martinez, in a tape-recorded interview played for the jury, stated that Valenzuela called him, told him to get a gun, and directed him to the location of the car chase, and Valenzuela testified he called Martinez and told him to get a gun and come help him. This evidence could lead a reasonable jury to conclude that Valenzuela commanded Martinez to shoot at the Sentra, and it was not a miscarriage of justice to give the instruction.

Even if the trial court erred in giving the instruction, any error was harmless. Valenzuela would not have achieved a more favorable result had the instruction not been given. (See *People v. Watson, supra,* 46 Cal.2d at p. 836.) The court also gave an aiding and abetting instruction (CALJIC 3.01) under which the jury could have found Valenzuela guilty of murder as someone who, with knowledge of the perpetrator's unlawful purpose, "[b]y act or advice, aids, promotes, encourages or *instigates* the commission of the crime" (italics added). The prosecutor argued that theory in closing. Under

---

[14] "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission . . . or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed." (§ 31.)

these circumstances, it is not reasonably likely that the jury would have reached a different result if the court had not instructed the jury on compelling another to commit a crime.

As we conclude that no prejudice resulted from counsel's consent to the instruction, we reject Valenzuela's claim that his counsel was ineffective. (*Strickland v. Washington, supra,* 466 U.S. at p. 687; *In re Fields, supra,* 51 Cal.3d at p. 1079.)

IV.  *Defense counsel consented to the special allegation on count 4.*

Valenzuela argues that the trial court could not include the special allegation of shooting a firearm from a motor vehicle on count 4 because it was not charged in the information.

During discussion of the jury instructions, the court stated: "The other thing that I wanted to point out to the two of you is that with regard to one of the lesser-includeds that I intend [to] give, that being second-degree murder as to count four, there is a special allegation under Penal Code section 190, subdivision (d), that the murder was perpetrated by means of shooting a firearm from a motor vehicle intentionally at another person outside of the vehicle with the intent to inflict great bodily injury. [¶] I added an instruction for that, and I expect to include that on the lesser-included verdict form. I understand that normally it's something that would have to be pled and proved in the information. But because we're dealing with the lesser-included offense and what was charged originally, was first-degree murder, obviously, the allegation wasn't there. I assume that neither of you has any objection to me instructing on it or including it in the verdict form." The prosecution assented, and the court asked defense counsel, who stated, "No objection, your honor."[15]

Section 190, subdivision (d) states: "Every person guilty of murder in the second degree shall be punished by imprisonment in the state prison for a term of 20 years to life if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury." The court gave instructions on second degree murder as a lesser included offense and an instruction on the allegation of shooting a firearm from a motor vehicle.[16]

---

[15] Defense counsel also agreed to the amendment of the information by interlineations to add three counts of shooting at an occupied vehicle, in violation of section 246 (counts 7–9) with related allegations of personal firearm use (§ 12022.5) and gang allegations (§ 186.22, subd. (b)(4)). Valenzuela does not challenge this amendment.

[16] The instruction stated in relevant part: "It is further alleged in Count 4 that defendant perpetrated a murder by means of shooting a firearm from a motor vehicle, intentionally at

The jury found Valenzuela guilty of second degree murder of Gonzalez and found true the section 190, subdivision (d) allegation. Without objection by the defense, the court sentenced Valenzuela to 20 years to life on count 4 pursuant to section 190, subdivision (d).

■ Valenzuela argues that his counsel did not affirmatively consent to the inclusion of section 190, subdivision (d) in the instruction and on the verdict form. We disagree. Defense counsel expressed no concerns about the instruction. When asked directly by the court, she stated that she had no objection, and she interposed no objection when the sentence was announced. A defendant who acquiesces to have the trier of fact consider a nonincluded offense not alleged in the indictment " 'cannot legitimately claim lack of notice, [and] the court has jurisdiction to convict him of that offense.' " "[T]he true explanation is that the due process notice requirement, upon which the rule against nonincluded offense convictions is based, is satisfied in such cases. [Citation.] 'When the defendant acquiesces in conviction of an uncharged offense . . . no amendment [of the indictment or information] is necessary.' [Citation]." (*People v. Toro* (1989) 47 Cal.3d 966, 973 & fn. 4 [254 Cal.Rptr. 811, 766 P.2d 577], disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3 [76 Cal.Rptr.2d 239, 957 P.2d 928].) "The same rules apply to enhancement allegations." (*People v. Haskin* (1992) 4 Cal.App.4th 1434, 1438 [7 Cal.Rptr.2d 1].) Counsel consented to the inclusion of the allegation without amendment of the information, and Valenzuela has therefore forfeited the claim that notice was inadequate. (*People v. Bright* (1996) 12 Cal.4th 652, 671 [49 Cal.Rptr.2d 732, 909 P.2d 1354], overruled on other grounds in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6 [21 Cal.Rptr.3d 179, 100 P.3d 870].)

■ Further, second degree murder is a lesser included offense of premeditated murder, with which Valenzuela was charged in count 4 of the information. "There is no question defendant was on notice he could be convicted of . . . a lesser included offense. The Supreme Court has repeatedly stated that an accusatory pleading provides notice of the specific offense charged and also of necessarily included offenses. [Citations.] Therefore, the [greater] charge . . . against defendant necessarily provided notice he could be convicted of [the lesser included offense]." (*People v. Shoaff* (1993) 16 Cal.App.4th 1112, 1117 [20 Cal.Rptr.2d 464].) Valenzuela had notice that he could be convicted of the lesser included offense of second degree murder, although it was not alleged in the information. The section 190,

---

another person outside of the vehicle with the intent to inflict great bodily injury. [¶] If you find the defendant guilty of second degree murder, you must determine whether: [¶] 1. The murder was perpetrated by means of shooting a firearm from a motor vehicle; [¶] 2. The perpetrator intentionally shot the firearm at another person or persons outside the vehicle; and [¶] 3. The perpetrator, at the time he shot the firearm, specifically intended to inflict great bodily injury." The verdict form included the allegation and the jury found it true.

subdivision (d) allegation only applies to second degree murder. The court, as was its duty, instructed the jury on the lesser included offense of second degree murder. The court recognized that section 190, subdivision (d) would usually be alleged in the information if the charge had been second degree, not first degree, murder, but given the circumstances of the case, asked counsel to agree to its inclusion in the instructions and the verdict form.

Valenzuela argues that his counsel was ineffective in consenting to the instruction and verdict form. We disagree. Valenzuela does not allege that he did not have adequate notice of the prosecution's theory of the crime, which was that he shot at the Sentra out of his vehicle, or explain how his defense would have been different had the enhancement been included in the information. Valenzuela does not and cannot advance any explanation how he was prejudiced by counsel's consent, and so counsel was not ineffective. (*Strickland v. Washington, supra*, 466 U.S. at p. 687; *In re Fields, supra*, 51 Cal.3d at p. 1079.)

## V. *Valenzuela's sentence on the gang enhancement must be modified.*

Valenzuela claims, and respondent concedes, that the trial court erred in imposing a 15-year minimum parole eligibility period on counts 5 and 6 pursuant to section 186.22, subdivision (b)(5). The jury convicted Valenzuela of attempted murder in counts 5 (Flores) and 6 (Sanchez, or "Smokes") and found true the allegations that a principal personally used a handgun during the offenses within the meaning of section 12022.53, subdivisions (d) and (e)(1), and that the offenses were committed for the benefit of a street gang. The court sentenced Valenzuela to consecutive terms of 40 years to life, consisting of 15 years to life under section 186.22, subdivision (b)(5), added to 25 years to life pursuant to section 12022.53, subdivisions (d) and (e).

Section (e)(2) of section 12022.53 provides, however, "An enhancement for participation in a criminal street gang . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense." The jury found only that a *principal* personally used a firearm in the commission of the attempted murders in counts 5 and 6. Therefore, Valenzuela was not subject to an enhancement for participation in a criminal street gang, in addition to the enhancement imposed under section 12022.5. (*People v. Brookfield* (2009) 47 Cal.4th 583, 590 [98 Cal.Rptr.3d 535, 213 P.3d 988].)

The judgment must be modified to stay imposition of the 15-year minimum parole eligibility term set forth in section 186.22, subdivision (b)(5) on counts 5 and 6. (See *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1129–1130 [77 Cal.Rptr.3d 569, 184 P.3d 702].)

## DISPOSITION

The judgment must be modified to stay imposition of the 15-year minimum parole eligibility term on counts 5 and 6. In all other respects, the judgment is affirmed.

Mallano, P. J., and Chaney, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 11, 2012, S197913.