Filed 4/23/25  P. v. Tinajero CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B322315 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA473417) |
| v. | |
| ANGEL OSVALDO TINAJERO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ray G. Jurado, Judge.  Affirmed.

Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Angel Osvaldo Tinajero appeals from a judgment of conviction after the jury found him guilty of first degree murder and possession of a firearm by a felon, and found true a firearm allegation under Penal Code section 12022.53, subdivision (d).[1] Tinajero raises numerous claims on appeal, contending defense counsel provided ineffective assistance of counsel by eliciting an improper opinion from a witness, failing to object to witness testimony, and failing to request the trial court strike the firearm enhancement; the trial court should have sua sponte instructed on imperfect self-defense, heat-of-passion voluntary manslaughter, and duress; the court erroneously instructed on the contrived self-defense doctrine and on first degree murder; the court erroneously assisted the jury during deliberations; and the cumulative effect of the errors resulted in an unfair trial. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.    *Prosecution Evidence*

    1.    *Events preceding the murder*

Tinajero was a member of the El Sereno gang. He lived at his mother's house with his then-girlfriend, Mayra Magallon. Sometimes he borrowed Magallon's gray Nissan Altima. On two occasions in May and November of 2018, Magallon noticed Tinajero carrying a gun.

On December 3, 2018 Magallon spent the night with Tinajero at his mother's house. When she woke up the next day, Tinajero was gone, along with her car and cell phone.

---

[1]    All undesignated statutory references are to the Penal Code.

2

That same morning, Henry Arnal called his brother, identified at trial as Michael V., and asked him for help with his van that had broken down.  Michael (who is a mechanic) agreed to help.  Arnal told Michael, " 'I'm on Sheffield,' " which Michael knew was an avenue in El Sereno, an East Los Angeles neighborhood.  Michael "had a really bad feeling" that "something was going to go down."  Arnal, an El Sereno gang member, had been released from prison a few months earlier.  Since his release, Arnal had been staying at his mother's house, "[a]way from El Sereno," which meant Arnal was having "problems" with the El Sereno gang.  Sheffield Avenue was inside El Sereno gang territory.  Michael was a long-time member of a different gang— the Geraghty Loma gang.

Michael told Arnal that it would take him about an hour to get there.  He texted his girlfriend, "Hey, if anything happens to me[,] I'm on Sheffield with my brother."  Michael drove directly to El Sereno.

2.     *The murder*

Around noon, Michael arrived at the corner of Sheffield and Norwich.  Arnal walked down a driveway, approached a van parked on the sidewalk, and said, " 'Let me unlock the van.' "  Michael did not see Arnal holding a gun but testified he "could have had a gun," because it was "second nature" for Arnal to have a gun given he was a gang member.

Michael looked in his rearview mirror and saw a gray Nissan Altima, which he later identified at trial as Magallon's car, pulling up behind him.  Before the Nissan came to a full stop, a man Michael later identified as Tinajero jumped out of the front passenger side with a gun in his hand and made eye contact with Arnal.  Arnal, who did not appear to be holding a gun,

3

immediately ran behind the van, where Michael could no longer see him. Tinajero chased after Arnal and fired his gun at Arnal. Michael testified it sounded like Tinajero "shot the entire clip he had." A second shooter seated in the backseat of the Nissan fired a gun out the window. Michael reversed his car and smashed into the Nissan. The Nissan then drove away.

Tinajero emerged from behind the van with the gun in his hand and ran off; Michael drove after him. Tinajero ran down a driveway and threw the gun down. When Tinajero reached a garage at the end of the driveway, Michael "tried to smash him with [his] car" but missed and crashed into the garage. Michael got out of his car, ran up to Tinajero, and fought him. Michael testified Tinajero was wearing "shooter clothes," i.e., he was wearing multiple layers and gloves that would make it easier to quickly dispose of evidence.

Meanwhile, a witness identified as Paula R., who was staying at the house at the end of the driveway, heard a crash and a loud boom. She ran outside to find a car had hit the garage and two men were fighting. She also saw a gun on the ground on the side of the house. She picked it up with a towel and called 911.

3. *Investigation at the scene*

Around noon, Officer Hugo Vasquez from the Los Angeles Police Department (LAPD) responded to the scene and found Michael holding down Tinajero in a backyard. Vasquez arrested Tinajero, who was out of breath, appeared tired, and had blood on his face. Paula gave Vasquez the firearm, which contained no unspent bullets. Another officer detained Michael, who did not have any weapons on him.

4

LAPD Officer Erick Ramirez found Arnal lying on the ground near the van. Arnal died later that day of a gunshot wound to the torso. He had a total of four gunshot wounds in his abdomen, buttocks, thigh, and calf. Two gunshots entered the front of his body and two entered his back. Two bullets were recovered: one from Arnal's right upper back and another from his lower leg.

At the scene of the shooting, LAPD Detective Vincent Carreon found 12 spent .40-caliber cartridge casings and one spent .45-caliber casing. Several were near the van, including the .45 caliber casing, and three .40 caliber casings were in the roadway. A folding knife, with its blade exposed, was on the sidewalk near Arnal's body.

At approximately 12:16 p.m., LAPD Officer Rodolfo Pardo responded to a call of a "vehicle left at scene" at an intersection one-third of a mile from the shooting. He found a gray Nissan Altima abandoned with its engine running. It had collision damage and a flat tire, and the passenger windows on one side of the car had been "shot out." There were two .45 caliber casings on the driver's seat and two more on the back seat. Michael identified the abandoned Nissan as the vehicle involved in the shooting.

4. *Firearm evidence*

LAPD Criminalist Fadil Biraimah performed a bullet path analysis on the Nissan. One area of damage on the rear right-side window was consistent with the passage of a bullet shot through the window from the interior of the car. The second area of damage was on the front right-side window, within which were two separate areas, "Defect B" and "Defect C," that were consistent with the passage of bullets. "Defect B" did not have

5

enough glass material left for Biraimah to determine the directionality of the bullet. As for "Defect C," Biraimah opined the bullet traveled from the interior to the exterior of the car. Biraimah opined that if four bullet casings were discovered inside the car, it was possible four shots were fired from inside the car—one through the rear right-side window and three through the front right-side window.

Biraimah did not find impacts from exterior sources on the car. As he explained, when cars are shot from the exterior, "[t]hose bullets will continue and can strike additional surfaces, either of the vehicle or occupants of the vehicle." Biraimah did not find any "continuation impacts" inside the car.

LAPD Criminalist Matthew Saucedo analyzed the firearm and bullet casings recovered from the crime scenes. The serial number on the recovered firearm had been manually removed. After test-firing the firearm, Saucedo determined it had fired the 12 recovered .40-caliber bullet casings. He also determined that a different, unknown firearm fired the four .45-caliber casings recovered from the Nissan. The remaining .45-caliber casing recovered near the van was fired from yet another unknown firearm. Thus, three guns were possibly used. No evidence was introduced regarding the two bullets that were recovered from Arnal's body.

5.      *Cell phone evidence*

Detective David Manriquez performed a "cellphone extraction" on Arnal's cell phone, extracting all text conversations between Arnal and a contact named " 'Saint Little.' " Tinajero's gang moniker was "Little Saint."

On December 2, two days before the murder, Saint Little texted Arnal, " 'How have you been my boy?' " The next day, they

exchanged several text messages.  Arnal told Saint Little that he was in El Sereno.

6.  *Green light*

After Arnal's murder, Michael learned that Arnal had been on the "green light" list.[2]  A green light is a "license to kill" or "death warrant."  If a person is on the green light list, "any gang member from any area, any turf, ha[s] the right to take you out if he's aware that you have a green light."  Michael testified that "when it came out" that he intervened in Arnal's murder, his gang "immediately" put him on the "green light" list.  The fact that both Arnal and Michael were on the green light list gave Michael "pause in cooperating" with the prosecution.

7.  Perkins *operation*

After Tinajero's arrest, officers placed an undercover informant, posing as a fellow inmate, in Tinajero's jail cell and secretly recorded their conversation.  This tactic is commonly called a "*Perkins* operation."[3]  The People played the entire recording of the *Perkins* operation for the jury.

Tinajero told the informant he was in jail "for a murder."  The informant asked him, "The guy you shot at, did you hit him?"  Tinajero said, "I think."  Tinajero added that he fired the "whole clip" from his gun.

---

[2]    The court admitted this fact for Michael's state of mind, not for its truth.

[3]    In *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), the United States Supreme Court held a criminal suspect who makes incriminating statements is not entitled to warnings under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*), "when the suspect is unaware that he is speaking to a law enforcement officer and gives a voluntary statement."  (*Perkins*, at p. 294.)

7

When the informant asked Tinajero how he got his injuries, Tinajero said he "was running" down the street, and "a . . . car pulled up out of nowhere." He kept running, but at some point his gun "fell out." "[A] few feet" from where his gun fell, he "ran into a house" and the car that was chasing him "crashed . . . behind [him]." A man got out of the car and "started beating [him]." The informant said, "you can say that . . . it was self-defense." Tinajero responded, "I had gloves on."

The informant warned Tinajero that if the victim had a relative inside the jail, Tinajero could "get wacked." Tinajero assured the informant that "as far as . . . what happened," he was "covered" and had "the right of way." He got "the green light and everything" from his "brothers from [his] barrio." The informant said, "At least you did your job," to which Tinajero replied, "Yeah." Later, the informant said, "The dude must have done something wrong." Tinajero responded, "They did, yeah. Yeah."

8.  *Tinajero's criminal history*

The parties stipulated that Tinajero had the following prior convictions: carrying a loaded firearm (Pen. Code, § 25850) in 2015, driving in willful or wanton disregard for safety of persons or property while fleeing from pursuing officers (Veh. Code, § 2800.2) in 2015, and possession of a firearm by a felon (Pen. Code, § 29800) in 2018.

B.  *Defense Evidence*

Eileen Eberhart testified that on the day of the murder, she was staying at a house near the intersection of Sheffield and Norwich. Arnal stopped by the home's garage, which was a "hangout space." He had three guns—"two handguns and one big

8

gun."  It was not unusual to see Arnal with guns because "that was the lifestyle" he was living.

Right before the shooting, Eberhart went to the store. When she returned, an ambulance was outside and Arnal was lying on the ground.  Someone asked Eberhart "to get the guns in the back that were [Arnal's] and give them to somebody else." She got two handguns—one was "under a bunch of wood" and the other one was "maybe" in the garage—and "just handed them over" to someone.  She could not remember to whom she gave the guns.  Eberhart denied she was a member of the El Sereno gang.

Summer Olivas testified that on the day of the murder she was in her home near the intersection of Sheffield and Norwich when she heard gunshots outside.  She looked out the window and saw a man lying on the ground.  A woman was screaming, crying, and "leaning over [him], . . . trying to get him up."  She was also going through his pockets, which Olivas thought was odd.  Detective Larry Oliande testified he spoke to Olivas on the day of the shooting, and she said she saw "a woman and several other people going through [Arnal's] pants pockets."

Ariel Lujan testified that Arnal occasionally stayed at his house near the intersection of Sheffield and Norwich.[4]  During the two weeks before the murder, Arnal had a gun and was acting paranoid, intimidating, and demanding.  Lujan did not want Arnal there, but Arnal refused to leave.

On the day of the murder, Arnal was at Lujan's house with a handgun tucked in his waist.  Lujan asked Arnal to give him some privacy, and Arnal "flashed" a handgun and said, " 'What

---

[4]  Lujan admitted he had felony convictions for assault with a deadly weapon and assault with a firearm and a pending charge for assault with a firearm (§ 245, subd. (a)(2)).

9

are you going to do if I don't leave?'" Arnal then appeared to notice a car outside. He said his brother was "'right there'" and ran outside. Lujan heard "a bunch" of "overlapping" gunshots from at least two different guns. Lujan denied he was an El Sereno gang member.

C.    *Rebuttal Evidence*

On February 7, 2020 defense investigator Jerry Pearman interviewed Lujan in prison. Lujan said he never saw Arnal with a gun before the murder.

LAPD Officer Jonathan Hilliger opined that, contrary to Lujan's testimony, Lujan was an El Sereno gang member: Lujan had admitted during a 2019 arrest that he was an El Sereno gang member, he had several El Sereno gang tattoos, he frequented El Sereno gang locations, and he had been arrested for crimes "consistent with gang activity." Hilliger saw Lujan in court during the trial and noticed one of his gang tattoos was much darker, which meant he was in good standing with the gang.

D.    *Jury Instructions, Verdict, and Sentencing*

The trial court instructed the jury with the following relevant jury instructions: murder (CALCRIM No. 520), first degree murder (CALCRIM No. 521), perfect self-defense (CALCRIM No. 505), contrived self-defense (CALCRIM No. 3472), possession of a firearm by a felon (CALCRIM No. 2511), and personally using a firearm, causing great bodily injury or death (CALCRIM No. 3150).

The jury found Tinajero guilty of first degree murder (§ 189, subd. (a)) and possession of a firearm by a felon (§ 29800, subd. (a)(1)). The jury also found that Tinajero personally and

10

intentionally discharged a firearm which caused great bodily injury within the meaning of section 12022.53, subdivision (d).[5]

On July 11, 2022 the court sentenced Tinajero to a total aggregate term of 50 years to life, consisting of 25 years to life for the murder and 25 years to life for the firearm enhancement. The court also sentenced Tinajero to a concurrent two-year term (the middle term) for the possession of a firearm, which the court stayed under section 654.

Tinajero timely appealed.

## DISCUSSION

A.   *Defense Counsel Did Not Provide Ineffective Assistance in Failing To Object to and Eliciting Improper Witness Testimony*
   1.   *Defense counsel's failure to object to Michael's opinion testimony*

Tinajero contends defense counsel provided ineffective assistance of counsel by failing to object to Michael's testimony about the concept of a "green light" in gang culture, Tinajero's and his accomplice's "mental state," and "what happened in the Nissan . . . before the shooting." We reject the contentions.

---

[5]   The People alleged in the information that Tinajero committed both offenses for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). The People further alleged several circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(1)-(a)(3), (a)(8), (b)(1)-(b)(5)). However, the court granted the People's motion to dismiss these allegations following the verdict.

11

a.    *Relevant testimony*

The prosecutor asked Michael whether he knew his brother was dead after witnessing the shooting.  Michael responded:

> Well, clearly [Tinajero] shot the entire clip he had. You know, when [Tinajero] went behind the car[,] all the gunshots I heard, he had to fire the whole clip into [Arnal].  So I don't see how somebody that does not have the intent of murder on their mind is going to empty a whole clip into an individual.  If you empty a whole clip into somebody it's because you want them dead.

Later, the prosecutor asked Michael, "What about the fact that [Tinajero] tossed the gun?  I know you said that that made you think initially, like, okay, he's out of bullets, he emptied his clip."  Michael said:

> So when he came back from behind the van to get back in the vehicle, there's only one reason why he came back that quickly, because he fired off every shot he had.  Being as young as he looked and the situation that was going down, in my mind when I was that age and I was doing those things, I shot off my whole clip and everybody I know shot off their whole clip, because you don't stop and think, oh, I better hold something in reserve.  No, you're there to shoot somebody—especially when you're in [your] own neighborhood, you're even that much more comfortable, because there's no threat around you

12

because that's your territory.  So you can be relaxed
and calm, do what you gotta do and get out of there
with no exterior threat to you. . . .  So . . . when he
ran down the driveway and he threw that gun . . . I
was, like, I know you're out and I know you don't
have no more weapons.

Later, the prosecutor asked, "The fact that the other
passenger was also shooting from the car, . . . what did that make
you think?"  Michael responded,

"So you have three people in the car. . . .  [T]he driver
. . . , he probably doesn't carry a gun, maybe he does,
maybe he doesn't, who knows, but he's not getting out
of the car. . . .  [The] two [passengers] have guns.
And you go to do a hit and only one guy gets [out of
the car] and shoots his gun and the other guy[,] . . . in
order to be able to claim I did something, he took his
gun and shot out the window. . . .  [¶]  [H]e wasn't
going to go back with a [full] gun either. . . .  If he
goes back with a full gun he'd get in a lot of trouble."

The prosecutor also asked Michael about the concept of a
"green light" in gang culture.  The prosecutor asked Michael, "If
you are given an order or you know that there's a green light . . .
and you go with a couple homeboys to take this person out and
you don't empty that clip and the person survives?"  Michael
responded, "So if you go do a hit and you fail at your hit . . . ,
especially if it comes back that you had half a clip of bullets still,
. . . your sincerity, your commitment is now in question.  You

13

raised your hand for this. You said you were going to take care of it and you failed."

The prosecutor then asked what it meant to " 'raise your hand.' " Michael said, "When you raise your hand you say, I'll accept this responsibility and I'll do it. . . . So when you raise your hand and you don't do something, you don't actually follow through with what you agreed to, that can come back on you and you can get green lighted for that."

The prosecutor added, "Now, if you're just following the knowledge that, hey, there's a green light on somebody and if I see this person I need to act. Would . . . you also be expected to take care of it?" Michael responded that if "you just randomly run into somebody" on the green light list, "guys aren't going to want to [take the person out]. . . . What are the chances of you being armed 24/7 and you [randomly] run across someone with a green light and you take them out? Very, very small window of possibility."

> b. *Michael's testimony about the "green light"*

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. [Citation.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 653; *In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).)

14

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of professional assistance." ' [Citations.] '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926; accord, *People v. Ledesma* (2006) 39 Cal.4th 641, 746.) Accordingly, to prevail on a claim that counsel's performance fell below an objective standard of reasonableness, a defendant must show "counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " ' " '[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

Defense counsel's failure to object to Michael's testimony about the concept of a "green light" in gang culture was not deficient performance. The testimony was admissible as expert opinion. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel."].)

"While lay witnesses are allowed to testify only about matters within their personal knowledge (Evid. Code, § 702, subd. (a)), expert witnesses are given greater latitude. 'A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him

15

as an expert on the subject to which his testimony relates.'  (Evid. Code, § 720, subd. (a).)  An expert may express an opinion on 'a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  (Evid. Code, § 801, subd. (a).)."  (*People v. Sanchez* (2016) 63 Cal.4th 665, 675.)  " '[T]he culture and habits of criminal street gangs' " is an appropriate subject matter for expert testimony.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.)

As the parties acknowledged at oral argument, Michael's opinion testimony about gang culture was proper.  His experience and high rank in the gang qualified him to testify about gang culture:  he had been a member of the Geraghty Loma gang for 33 years and an associate of the Mexican mafia who had "given orders" as well as himself "committed a lot of crimes for the gang," including attempted murder and murder.  (See Evid. Code, § 720, subd. (a) [person is qualified to testify as an expert if "he has special knowledge skill, experience, training, or education"]; *People v. Ojeda* (1990) 225 Cal.App.3d 404, 408 ["Expertise . . . 'is relative to the subject,' and is not subject to rigid classification according to formal education or certification."].)  Further, the concept of a "green light" is sufficiently beyond common experience that expert opinion on the subject matter would assist the jury.  (See e.g., *People v. Lopez* (2012) 208 Cal.App.4th 1049, 1059 [gang expert testified that gang leaders had obligation to attack gang members who had a "green light" put on them]; see also *People v. Vang, supra*, 52 Cal.4th at p. 1049, fn. 5 [" 'It is difficult to imagine a clearer need for expert explication than that presented by a [gang] subculture in which . . . mindless retaliation promotes "respect." ' "]; *People v. Gonzalez* (2006) 38 Cal.4th 932, 945 [testimony regarding gang's practice of

16

intimidating persons who testify against the gang held to be sufficiently beyond common experience].)

Even assuming Michael's opinion about gang culture was inadmissible, Tinajero acknowledged on appeal that defense counsel could have had a reasonable tactical decision for not objecting. Indeed, during oral arguments, Tinajero's appellate counsel relied on Michael's gang testimony in arguing that Tinajero only shot at Arnal under duress, due to his concern he would be "greenlighted" by his gang if he failed to follow through on their order to kill Arnal. Thus, Tinajero has failed to establish defense counsel's performance was deficient.

Further, Tinajero has failed to demonstrate a reasonable probability of a different outcome at trial but for the admission of Tinajero's testimony. (*People v. Rices*, *supra,* 4 Cal.5th at p. 80.) Substantially similar evidence about the concept of a "green light" was admitted through other witnesses. Officer Hilliger testified about the meaning of a "green light," and Tinajero admitted during the *Perkins* operation that he shot Arnal after receiving a green light from his gang. Viewing the record as whole, there is no reasonable probability the jury would have reached a more favorable verdict had the trial court excluded Michael's testimony concerning a green light. (See *People v. Johnson* (2019) 8 Cal.5th 475, 518 [error in admitting evidence held harmless when similar evidence was properly admitted]; *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 [*Watson*'s harmless error standard is substantially the same as *Strickland*'s prejudice standard].)

17

c. *Michael's testimony about Tinajero and his accomplice's "mental state" and "what happened in the Nissan"*

As for Michael's testimony about Tinajero and his accomplice's state of mind, Tinajero is correct that it is generally improper for an expert or lay witness to give an opinion about another person's state of mind. (*People v. Duong* (2020) 10 Cal.5th 36, 60-61; *People v. DeHoyos* (2013) 57 Cal.4th 79, 130; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1551.) Nor may a witness express an opinion as to the guilt or innocence of the defendant. (*Duong*, at pp. 60-61 ["opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact"].) Michael's testimony ran afoul of these principles when he testified Tinajero had the "intent of murder," "want[ed] them dead," was "there to shoot somebody," and planned "to do a hit."[6] Michael also improperly testified that Tinajero's accomplice planned "to do a hit" and fire his bullets "in order to be able to claim [he] did something."

Even assuming defense counsel was deficient for failing to object to this testimony, however, Tinajero has failed to demonstrate a reasonable probability that he would have achieved a better result had Michael not given these opinions. In

---

[6] Although Michael at times referred to "somebody" and "you," considering the context of his testimony, the implication was that he was referring to Tinajero himself, not hypothetical individuals. Michael did not express his opinion in response to a hypothetical question but rather in response to questions about Tinajero. (See *People v. Vang, supra*, 52 Cal.4th at p. 1049 [recognizing "the critical difference between an expert expressing an opinion in response to a hypothetical question and the expert's expressing an opinion about the defendants themselves"].)

*People v. Riggs* (2008) 44 Cal.4th 248 (*Riggs*), the prosecutor elicited opinions from the lead investigator that the defendant's statements were untruthful, and that the defendant was guilty of the crimes he was accused of (murder and robbery). (*Id*. at p. 300.) The Supreme Court concluded that any misconduct from eliciting the opinions was not prejudicial, because the investigator's "testimony that he believed defendant was guilty as charged and was untruthful . . . did not present any evidence to the jury that it would not have already inferred from the fact that [the investigator] had investigated the case and that defendant had been charged with the crimes. There was no implication from the questions or answers that [the investigator's] opinions were based upon evidence that had not been presented to the jury. [Citation.] In addition, we see nothing in the record that would lead us to conclude that the jury was likely to disregard the instructions it received concerning its duty to decide the issues of credibility and guilt based upon its own assessment of the evidence, not the opinions of any witness." (*Ibid*.; accord, *People v. Woodruff* (2018) 5 Cal.5th 697, 762.)

For similar reasons here, there is no prejudice. "[T]he jury would hardly have been surprised" that the prosecution's lead eyewitness had concluded Tinajero and his accomplice had the intent to kill. (*People v. Woodruff, supra*, 5 Cal.5th at p. 762; see *Riggs, supra*, 44 Cal.4th at pp. 300-301.) None of Michael's reasons for making those conclusions was based on information that the jury had not heard. Additionally, we presume the jury followed the court's instructions concerning its duty to decide the issues of guilt based on its own assessment of the evidence, not the opinions of any witnesses. (See CALCRIM No. 332 ["The meaning and importance of any opinion are for you to decide."];

19

*People v. Chhoun* (2021) 11 Cal.5th 1, 30 [jury presumed to follow instructions].)[7]

Moreover, there was overwhelming evidence against Tinajero aside from Michael's opinion testimony. Michael testified he personally saw Tinajero jump out of the Nissan with a gun in his hand and chase Arnal, who appeared to be unarmed and did nothing to provoke the attack. Michael then heard Tinajero fire numerous shots at Arnal at close range. Tinajero was caught immediately after the shooting, in close proximity to the discarded gun that had fired 12 casings found near Arnal's body. The forensics analysis on the abandoned Nissan was consistent with Michael's testimony. And Tinajero admitted during the *Perkins* operation to firing his entire clip at Arnal. Further, there was strong evidence of motive, with Tinajero admitting to killing Arnal after receiving a "green light" from the El Sereno gang. Therefore, "[t]he jury's exposure to the unsurprising opinions of the [prosecution's witness Michael] . . . could not have influenced the verdict—especially in light of the overwhelming evidence against [Tinajero]." (*Riggs*, *supra*, 44 Cal.4th at pp. 300-301.)

2. *Defense counsel's solicitation of improper opinion testimony from Detective Manriquez*

Tinajero asserts defense counsel also provided ineffective assistance of counsel by asking Detective Manriquez for his

---

[7] Michael properly testified to events he personally perceived, i.e., "the driver . . . [is] not getting out," the "two [passengers] have guns," "one guy gets [out] and shoots his gun," and "the other guy . . . shot out the window." (See Evid. Code, § 702, subd. (a).) Thus, defense counsel was not deficient for failing to object to this evidence.

opinion on the credibility of Michael, the prosecution's key witness. He points to the following exchange during defense counsel's cross-examination of Manriquez:

Q: You know that the Sureños[8] have a hierarchy structure; correct?

A: Yes.

Q: And you know that those hierarchy structures there [are] certain rules that certain people in the hierarchy structures have to follow; right?

A: That's the testimony from Michael . . . , yes.

Q: Do you find Michael . . . to be credible?

A: In that instance, yes.

Q: [Are] there instances where you don't find Michael . . . to be credible?

A: No.

"Although in extreme circumstances cross-examination may be deemed incompetent [citation], normally the decision . . . how to cross-examine witnesses comes within the wide range of tactical decisions competent counsel must make." (*People v. Cleveland* (2004) 32 Cal.4th 704, 746.) "Even where defense counsel may have ' "elicit[ed] evidence more damaging to [defendant] than the prosecutor was able to accomplish on direct," ' " our Supreme Court has cautioned courts should be " 'reluctant to second-guess counsel' [citation] where a tactical

---

[8] Manriquez testified the Sureños are an umbrella organization of gang members affiliated with the Mexican Mafia that hail from "south of the Delano line" in Los Angeles. The El Sereno gang was part of the Sureños.

choice of questions led to the damaging testimony." (*People v. Williams* (1997) 16 Cal.4th 153, 217.)

Even though the truthfulness of a witness is not a proper subject of lay or expert opinion (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 (*Coffman*)), and here defense counsel elicited arguably unhelpful testimony from Manriquez vouching for Michael's credibility, Tinajero has not established there could be no tactical reason for his counsel's line of questioning. Because Michael was a gang member, defense counsel reasonably may have expected Manriquez to qualify his opinion about Michael's credibility in a way that would assist the defense.

Moreover, Tinajero has failed to demonstrate prejudice. Defense counsel's questions were brief, and neither counsel referred to Manriquez's answers during closing argument. Further, as discussed, we presume the jury followed the court's instructions that it was not bound by the detective's opinions, and it was the sole judge of the credibility of witnesses. (See CALCRIM Nos. 226, 332.) In addition, Michael's testimony was corroborated by the evidence from the crime scene (including the firearm evidence and Nissan Altima evidence) and by Tinajero's statements during the *Perkins* operation. Based on these circumstances, we conclude Tinajero has failed to demonstrate prejudice. (See *People v. Lapenias* (2021) 67 Cal.App.5th 162, 180 [expert witness's improper opinion that victim was telling the truth was not prejudicial because his testimony was brief, counsel only briefly mentioned the testimony in closing arguments, the jury was instructed with CALCRIM Nos. 226 and 332, and the victim's testimony was corroborated by other evidence].)

B.     *Alleged Instructional Errors*

1.     *Any error in the instructions on first degree murder was harmless*

Tinajero asserts the court instructed the jury with "conflicting definitions" of first degree murder, and this error was prejudicial.  Even if the court erred in its instructions on first degree murder, we conclude the error was harmless beyond a reasonable doubt.

Murder is the unlawful killing of a human being with malice aforethought.  (§ 187, subd. (a).)  Malice "may be express or implied."  (§ 188, subd. (a).)  "It is express when there is a manifest intent to kill."  (*People v. Gentile* (2020) 10 Cal.5th 830, 844; see § 188.)  " 'It is implied . . . "when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' "  (*People v. Delgado* (2017) 2 Cal.5th 544, 571.)  For a killing with malice aforethought to be first rather than second degree murder, there must be "more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death."  (*People v. Chiu* (2014) 59 Cal.4th 155, 166, superseded by statute on other grounds, as stated in *People v. Hin* (2025) 17 Cal.5th 401, 542.)

The court instructed the jury with the standard definition of willful, deliberate, and premeditated murder in CALCRIM No. 521, including:  "The defendant acted willfully if he intended to *kill*.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the

23

consequences, *decided to kill*. The defendant acted with premeditation if he *decided to kill* before completing the act that caused death." Tinajero concedes this portion of the instruction was proper. However, the court then included extra bracketed language in CALCRIM No. 521 that is intended to be given only when the alleged offense is murder by means of torture, which does not require an intent to kill, but requires only an intent to torture. (See CALCRIM No. 521; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 201.)[9] The additional bracketed language given to the jury provided as follows: "A person commits an *act* willfully when he or she does it willingly or on purpose. A person deliberates if he or she carefully weighs the considerations for and against his or her choice and, knowing the consequences, *decides to act*." These particular instructions referred to an intent to commit an act, not an intent to kill. After these extra instructions, the court repeated the standard definition of premeditation, stating, "The defendant acted with premeditation if he *decided to kill* before completing the act that caused death."

Tinajero contends "the conflicting instructions given by the court misled the jury into believing the requirements for torture should be applied in determining whether Tinajero was guilty of premeditated and deliberate first-degree murder." Without the error, he posits "there is more than a reasonable chance that at

---

[9]   In contrast to first degree murder with malice aforethought, "murder by means of torture, a statutorily listed type of first degree murder (§ 189), does not require an intent to kill, but requires the intent to torture, and requires the same proof of deliberation and premeditation as is required of other kinds of first degree murders." (*People v. Whisenhunt*, *supra*, 44 Cal.4th at p. 201.)

least one juror would have doubted whether Tinajero had the requisite mental states for first-degree murder," and "it cannot conclusively be shown that the jurors found Tinajero had the intent to kill."

At worst the trial court presented the jury with both a valid and an invalid instruction on first degree murder. "Where a jury is instructed on alternate theories of liability, one legally valid and one legally invalid, a federal constitutional error has occurred." (*In re Lopez* (2023) 14 Cal.5th 562, 580 (*Lopez*).) In this circumstance, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.)

We may hold such an error harmless "where it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings that would support a valid theory of liability." (*Lopez*, *supra*, 14 Cal.5th at p. 568.) In making this assessment, we must "rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well." (*Ibid*.)

We conclude any error here was harmless beyond a reasonable doubt, because, after examining the entire cause, we conclude it is impossible for the jury here to have found Tinajero guilty of first degree murder without also finding he intended to kill. The trial court properly told the jurors that in order to convict Tinajero of first degree murder, they had to find he "acted

willfully, deliberately, and with premeditation." The trial court also properly told the jurors twice—including immediately after the challenged portion of the instruction—that "[t]he defendant acted with premeditation if he *decided to kill* before completing the act that caused death." (Italics added.) Thus, the court's instruction on premeditation was consistently, legally valid. This means that when the jury found that Tinajero "acted willfully, deliberately, and with premeditation," it necessarily found Tinajero "decided to kill" beforehand.

Even if the court improperly instructed the jurors in stating that willfulness and deliberation required a decision to "act," the jury was instructed on only one type of action—an "act that cause[d] death" or, stated a similar way, an act "to kill." Had the court instructed the jury with the full instruction on murder by torture, the jury would have been told it need only find that Tinajero acted with the "inten[t] to inflict extreme and prolonged pain on the person killed." (CALCRIM No. 521.) It also would have been explicitly instructed that "[a] finding of torture does not require that the defendant intended to kill." (CALCRIM No. 521.) Because the jury was not instructed with these alternate definitions, it would have no cause to believe that it could find Tinajero guilty of first degree murder based on anything other than his intent to kill.

Additionally, the prosecutor's closing argument confirmed the jury had to find Tinajero had an intent to kill Arnal. (See *People v. Aledamat*, *supra*, 8 Cal.5th at p. 14 [holding arguments of counsel may support conclusion instructional error was harmless].) At no point did the prosecutor repeat the court's instructions regarding a murder by torture charge. Instead, he read to the jury the legally valid portion of the standard

instruction on deliberation and premeditation, which told the jury twice that Tinajero needed to make a "decision to kill" to be guilty of first degree murder.  Tinajero points to the jury's deliberations (discussed in part C, *infra*), arguing "[t]he long deliberations, questions, and requests for readback of testimony further show how the jury struggled to reach its first-degree murder verdict and 'strongly suggest' the error was prejudicial." While it is true "our review for harmless error encompass 'the entire cause,' " including evidence of the jury deliberations, if we "can conclude the error was harmless beyond a reasonable doubt . . . because any rational juror who made the findings reflected in the actual verdict and heard the evidence at trial would also have made the findings necessary to support a valid theory, such [evidence of jury deliberations] will not generally be significant." (*Lopez, supra*, 14 Cal.5th at p. 590.)  Because we conclude any rational juror who found Tinajero guilty of first degree murder would also have necessarily found he intended to kill, evidence of the jury's protracted deliberations is "no bar to a finding of harmlessness."  (*Ibid*.)

2.    *There was not substantial evidence to support an instruction on imperfect self-defense*

Tinajero requested that the trial court give the jury instructions on both perfect and imperfect self-defense.  The trial court agreed to instruct the jury on perfect self-defense, based on evidence suggesting Arnal may have fired a gun during the confrontation with Tinajero, but it found insufficient evidence to instruct on imperfect self-defense.  The court's ruling was correct.

Self-defense is either perfect or imperfect.  Perfect self-defense is a complete justification to murder, and such killing is not a crime.  (§ 197, subd. (3).)  "Perfect self-defense requires that

27

'one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 386.)  On the other hand, imperfect self-defense " 'occurs when a defendant acts in the actual but *unreasonable* belief that he or she is in imminent danger of great bodily injury or death.' " (*Ibid.*, italics added.)  Unlike perfect self-defense, imperfect self-defense is not a defense to murder; rather, it "reduces an intentional, unlawful killing to voluntary manslaughter, a lesser included offense of murder, by negating a defendant's malice." (*Ibid.*)

The fact that a trial court has instructed on perfect self-defense does not mean it must also instruct on imperfect self-defense.  (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1231 (*Valenzuela*); *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 834, disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.)  The court's duty to instruct on an imperfect self-defense theory arises only when " 'the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 883.) "In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense." (*People v. Moye* (2009) 47 Cal.4th 537, 541 (*Moye*).)

" '[T]he existence of "any evidence, no matter how weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit

consideration" by the jury.' " (*Moye, supra*, 47 Cal.4th at p. 553; accord, *People v. Williams* (2015) 61 Cal.4th 1244, 1263.) " ' "[S]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser included offense." ' " (*People v. Valdez* (2004) 32 Cal.4th 73, 116 (*Valdez*); accord, *Williams*, at p. 1264.)

We review de novo a trial court's decision not to give an instruction on a lesser included offense. (*People v. Simon* (2016) 1 Cal.5th 98, 133.) In so doing, we consider the evidence in the light most favorable to the defendant. (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Tinajero primarily asserts there was substantial evidence of imperfect self-defense based on the same evidence that justified giving the perfect self-defense instruction, i.e., evidence that allowed for a reasonable inference that Arnal fired a gun at Tinajero. First, witnesses testified Arnal was known to carry a gun, and that he had a gun on him shortly before the shooting. Then, during the shooting, witnesses heard overlapping gunfire. Two of the four bullets that penetrated Arnal entered the front of his body, suggesting he was facing Tinajero for some period. Further, forensics evidence established the possible presence of three guns at the scene—one gun linked to Tinajero and two unknown guns, one of which may have fired a bullet from the area of Arnal's van based on the recovery of an unknown casing there. And although officers did not recover a gun near Arnal's body, the jury could have reasoned that someone removed the gun before officers arrived, given people were rifling through Arnal's clothing while he lay on the ground.

29

If the jury credited this evidence, it could have reasonably deduced that Arnal had a gun and fired it at Tinajero. From this, the jury could have concluded that Tinajero had an actual belief that he was in imminent danger and that lethal force was necessary to defend himself against Arnal. (See *Viramontes*, at p. 1263.) This belief would have been objectively reasonable. (See *ibid.* [if jury believed victim fired gun at defendant, defendant's belief that he was in imminent peril and that lethal force was necessary "would appear to be objectively reasonable"]; see *Valenzuela*, *supra*, 199 Cal.App.4th at p. 1228.) This evidence suggesting Arnal may have fired a gun thus supported giving a perfect self-defense instruction to the jury.

However, the jury could not have both credited this evidence but concluded that Tinajero's belief in the need for self-defense was *unreasonable*. (See *Valenzuela*, *supra*, 199 Cal.App.4th at p. 1228.) It is hard to conceive of a scenario where someone being shot at *unreasonably* thought he or she was in danger. "A court must instruct on imperfect self-defense only 'when there is substantial evidence that the defendant killed in unreasonable self-defense.' [Citation.] A reasonable jury could not conclude that [Tinajero's] actual fear of imminent death or great bodily injury was unreasonable." (*Ibid.*)

*People v. Dunn* (2014) 58 Cal.4th 527, relied on by the trial court below, is instructive. Like here, the trial court instructed on perfect but not imperfect self-defense. On appeal, the court agreed with the trial court there was not substantial evidence to support the instruction on imperfect self-defense. (*Id.* at p. 562.) "Duff point[ed] to the confession that was played for the jury, in which he described [the victims] pulling multiple guns on him and then opening fire, and argue[d] the jury could have credited

30

that version of events.  Indeed it could have.  But the problem, at least for finding an obligation to instruct on voluntary manslaughter, is that if believed, Duff's version could lead only to a finding of justifiable homicide and a total acquittal on the murder charges. . . .  While Duff argue[d] the jury could have concluded he unreasonably misperceived the situation, the circumstances described by Duff le[ft] no room for such shades of gray.  Either he was attacked, in which case he committed no crime, or he was not, in which case he committed murder." (*Ibid*.; see also *People v. Nguyen* (2015) 61 Cal.4th 1015, 1049 [trial court correctly declined to instruct on imperfect self-defense because "there was no basis for the jury to find that defendant *unreasonably* believed he was in imminent danger" where victim had approached the defendant while carrying a gun; rather, any fear would have been reasonable]; accord, *People v. Szadziewicz*, *supra*, 161 Cal.App.4th at p. 834 ["Where, as here, the defendant's version of events, if believed, establish actual self-defense, while the prosecution's version, if believed, negates both actual and imperfect self-defense, the court is not required to give the [imperfect self-defense] instruction."].)

Tinajero alternatively argues the jury could have found that Tinajero had an actual but unreasonable belief in the need to use self-defense because "Arnal was armed with a knife." While there was evidence that officers found an open knife near Arnal, there was no evidence in the record suggesting Arnal was armed with or used the knife.  Any version of events involving Arnal's use of a knife would have been impermissible speculation that could not justify an instruction on imperfect self-defense. (See *People v. Simon*, *supra*, 1 Cal.5th at p. 132 ["[s]peculative,

31

minimal, or insubstantial evidence is insufficient to require an instruction"].)

Tinajero engages in further speculation, arguing in passing that "[a] reasonable juror could have also found that Tinajero fired the shots because he thought Michael or another gang member had a gun and fired shots at him." There is no evidence that Michael had a gun or that "another gang member" besides Michael was present during the shooting.[10]

Because there is no substantial evidence that Tinajero had an unreasonable belief that he needed to defend himself, the trial court correctly declined to instruct the jury on imperfect self-defense. (See *Valenzuela*, *supra*, 199 Cal.App.4th at p. 1231.)

3. *There was insufficient evidence to support a heat-of-passion instruction*

Tinajero asserts that the trial court should have sua sponte instructed the jury on heat-of-passion voluntary manslaughter as

---

[10] Tinajero argues, for the first time in his reply brief and only in one sentence, that "[a] juror could have also found that Tinajero's beliefs were unreasonable because [Arnal] only fired one shot." This contention is forfeited. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1218 ["Obvious reasons of fairness militate against consideration of an issue raised initially in the reply brief."] In any event, to the extent Tinajero argues that the amount of force used to defend himself (12 bullets) was unreasonably excessive, such a belief would not support an instruction on imperfect self-defense. (See *People v. Morales* (2021) 69 Cal.App.5th 978, 995 [defendant does not act in imperfect self-defense if he reasonably believes that danger is imminent and that the use of deadly force is necessary, but uses more force than necessary].)

a lesser included offense of murder.  We conclude there was no substantial evidence to warrant the instruction.[11]

A person who intentionally and unlawfully kills "upon a sudden quarrel or heat of passion" is guilty of voluntary manslaughter.  (§ 192, subd. (a).)  " 'Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.' [Citation.]  Heat of passion killing is distinct from malice murder because thought in some form is necessary 'to form either an intent to kill or a conscious disregard for human life.' [Citation.]  A heat of passion killing . . . is one caused by an unconsidered reaction to provocation rather than the result of rational thought." (*People v. Vargas* (2020) 9 Cal.5th 793, 827-828.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*Moye*, *supra*, 47 Cal.4th at p. 549.)  Objectively, the defendant's reason must, at the time of his act, be " 'so disturbed or obscured by some passion . . . to such an extent as would render an ordinary [person] of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 948, 957.)  "To satisfy this test, the victim must taunt the defendant or otherwise

---

[11]    We reject the People's argument that defense counsel forfeited this claim on appeal by failing to request the instruction.  "The trial court has a sua sponte duty to instruct on all lesser included offenses if there is substantial evidence from which a jury can reasonably conclude the defendant committed the lesser, uncharged offense, but not the greater." (*People v. Brothers* (2015) 236 Cal.App.4th 24, 29.)  Because we find no forfeiture, we need not address Tinajero's claim of ineffective assistance of counsel.

initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.) "To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye*, at pp. 550.) The passion must be of an "extreme intensity," such as "[v]iolent, intense, high-wrought or enthusiastic emotion." (*Beltran*, at p. 950, cleaned up.)

Tinajero argues that "[t]he same evidence that supports instruction on self-defense supports instruction on heat of passion." Specifically, Tinajero points to evidence that Arnal "fired at least one shot" and contends that "from this, the juror could find Tinajero shot [Arnal] in the heat of passion." Tinajero is incorrect.

Even if the evidence supported a theory of self-defense, it did not provide substantial evidence of subjective provocation. Tinajero points to no evidence that he "exhibited anger, fury, . . . rage," or any other intense emotion at the time of the killing. (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.) Tinajero did not testify at trial and his statements during the *Perkins* operation did not reveal anything about his state of mind before he shot Arnal. (Cf. *People v. Beverman* (1998) 19 Cal.4th 142, 163-164, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 [defendant's statements to police that he felt "immediate fear and panic" and "acted in one continuous, chaotic response" constituted sufficient evidence of subjective provocation]; *People v. Dominguez* (2021) 66 Cal.App.5th 163, 180 [defendants' testimony they felt " 'super panicked' " and " 'super scared' " after victim issued a gang challenge and lunged at them constituted sufficient evidence of

34

subjective provocation].)  A heat of passion instruction is not required in a case, such as this one, where "the *only* evidence of [heat of passion] is the circumstance that a defendant is attacked and consequently fears for his life."  (*Moye*, *supra*, 47 Cal.4th at p. 555.)  Because there was insufficient evidence of subjective provocation, the court did not err by not instructing the jury on heat of passion voluntary manslaughter.

4.      *The trial court properly instructed the jury on contrived self-defense and initial aggressor doctrines*

Tinajero asserts the court erred by instructing the jury with CALCRIM No. 3472, the instruction on the contrived self-defense doctrine, "because there was no evidence" supporting the instruction.  He also asserts the court erroneously gave a special instruction on the initial aggressor doctrine.

Tinajero forfeited both contentions by failing to object on these grounds.  (See *People v. Frandsen* (2011) 196 Cal.App.4th 266, 278 [failure to object to CALCRIM No. 3472 forfeited the error on appeal].)  We exercise our discretion to consider the merits and thus need not discuss Tinajero's associated claims for ineffective assistance of counsel.  (See *People v Lua* (2017) 10 Cal.App.5th 1004, 1014 (*Lua*).)

a.      *Contrived self-defense instruction*

The court instructed the jury with CALCRIM No. 3472, which told the jury that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."  We review the trial court's decision to give a particular instruction de novo.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

" 'It is error to give an instruction [that], while correctly stating a principle of law, has no application to the facts of the

35

case.' " (*People v. Debose* (2014) 59 Cal.4th 177, 205.)  The trial court must give a requested instruction only if it is supported by substantial evidence.  (*People v. Marshall* (1997) 15 Cal.4th 1, 39.)  " '[U]nsupported theories should not be presented to the jury.' "  (*Id.* at p. 40.)  However, giving an irrelevant or inapplicable instruction is generally harmless error.  (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

CALCRIM No. 3472 is "generally a correct statement of law."  (*People v. Eulian* (2016) 247 Cal.App.4th 1324, 1333 (*Eulian*).)  " '[T]he ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' " (*People v. Enraca* (2012) 53 Cal.4th 735, 761 (*Enraca*); see, e.g., *id.* at p. 762 [record supported giving the CALJIC analogue to CALCRIM No. 3472 because the defendant attacked the victim first]; *Eulian*, at p. 1334 ["defendant's conduct . . . provide[d] a factual predicate" for the trial court to instruct with a modified version of CALCRIM No. 3472 because the defendant "provoked the conflict, and . . . continued to be the aggressor until [the victim] responded, at which point defendant knocked her out with a series of punches"].)

Tinajero is incorrect that there was no factual support for instructing with CALCRIM No. 3472.  Michael testified that Arnal was standing on the sidewalk near his van when Tinajero "jumped out" of a car and pointed a gun at Arnal.  Arnal ran behind his van while Tinajero chased after Arnal and fired shots at him.  Although there was evidence to suggest Arnal had a gun

and fired it, Michael testified he did not see Arnal point a gun at Tinajero before Arnal ran behind the van and Michael lost sight of him. (See *People v. Ceja* (1993) 4 Cal.4th 1134, 1143 [reviewing court "must view the record favorably to the judgment below to determine whether there is evidence to *support* the instruction, not scour the record in search of evidence suggesting a contrary view"].) A rational jury could have concluded from these facts that, had Arnal fired his gun, he did so only *after* Tinajero initiated the shooting and only once Arnal got behind the van, where Michael could no longer see him. If the jury determined that Arnal fired his gun in response to Tinajero firing first, Tinajero "did not have the right to use force to settle a physical confrontation he arguably created." (*Eulian*, *supra*, 247 Cal.App.4th at p. 1334; see *Enraca*, *supra*, 53 Cal.4th at p. 761.) There was thus substantial evidence to support giving the instruction on contrived self-defense.

     b.  *Initial aggressor special instruction*

    The trial court granted the prosecution's request to specially instruct the jury that "[a]n aggressor whose victim fights back in self-defense may not invoke the doctrine of self-defense against the victim's legally justified acts." Defense counsel did not object, but requested that the instruction "be placed in another instruction, not in [CALCRIM No.] 505," the perfect self-defense instruction. The court gave the instruction separately.

    Tinajero contends defense counsel should have objected to the special instruction "as argumentative because it directed the jury to draw inferences favorable to the People from specific evidence on a disputed question of fact." Additionally, Tinajero contends "[c]ounsel exacerbated the error by labeling it as a

'special instruction' rather than asking the court to include [it] in CALCRIM [No.] 505."

The special instruction was not argumentative, and its placement within the instructions was not prejudicial. A jury instruction is improperly argumentative only if it " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Earp* (1999) 20 Cal.4th 826, 886.) The special instruction does not invite the jury to draw inferences favorable to either party, nor does it refer to specified items of evidence. It is a correct statement of the law. (See *Enraca, supra,* 53 Cal.4th at p. 761 [holding trial court properly instructed jury that self-defense doctrine may not be invoked "if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which legally justified his adversary's use of force"].) Therefore, the court did not err in instructing the jury with the prosecutor's requested special instruction.

5. *The court had no sua sponte obligation to instruct on duress, and there was insufficient evidence to support such an instruction*

Tinajero argues the court should have sua sponte instructed the jury that "duress may negate the deliberation or premeditation required for first degree murder."[12] (See *People v. Burney* (2009) 47 Cal.4th 203, 249 ["duress may negate the deliberation or premeditation required for first degree murder, and an instruction such as the one requested by defendant may be appropriate if warranted by the circumstances of the case"].) The contention is forfeited and fails on the merits.

---

[12] Tinajero concedes defense counsel did not request such an instruction.

An instruction that duress may negate premeditation or deliberation is a pinpoint instruction because it "relates the evidence of provocation to the specific legal issue of premeditation and deliberation." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 878.) " ' "[A] defendant has a right to an instruction that pinpoints the theory of the defense." ' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) However, "[t]he trial court is not required to give [a pinpoint] instruction on its own initiative, and if the instruction as given is adequate, the trial court is under no obligation to amplify or explain in the absence of a request that it do so." (*People v. Mayfield* (1997) 14 Cal.4th 668, 778, overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363.) Failure to request a pinpoint instruction "of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) Tinajero thus forfeited his contention regarding the court's failure to instruct on duress by failing to request such an instruction.

Even if counsel had requested it, the court would have properly declined to instruct on duress. "[A] trial court need not give a pinpoint instruction if it . . . is not supported by substantial evidence." (*People v. Bolden* (2002) 29 Cal.4th 515, 558.) For the court to instruct on duress, there must be substantial evidence of "a reasonable belief that threats to the defendant's life . . . are both imminent and immediate at the time the crime is committed." (*Coffman*, *supra*, 34 Cal.4th at p. 100.)

There was scant evidence supporting the duress pinpoint instruction. During the *Perkins* operation, Tinajero admitted his gang gave him "the green light" and "right of way" to kill Arnal. Michael testified that when a gang puts a "green light" on someone, that is "a license to kill" that person. Michael further

39

testified that if a gang member accepts responsibility for carrying out the "green light" order but does not "follow through" with it, that member "*can* get green lighted for that." (Italics added.) However, evidence that Tinajero *could* have been "green lighted" for not following through on a sanctioned killing is not sufficient to show Tinajero faced any actual danger. Moreover, the record is wholly devoid of any evidence that the danger was "imminent and immediate." (*Coffman, supra*, 34 Cal.4th at p. 100.) No instruction on duress was warranted.

C.      *The Court's Responses to Jury's Questions*

Tinajero argues the court failed to adequately respond to the jury's questions during deliberations and erroneously instructed the deadlocked jury. We reject both arguments.[13]

1.      *The jury expresses confusion on verdict forms, requests further instructions on first degree murder, and suggests it may be deadlocked*

On the second day of deliberations, the jury sent a note stating, "We aren't in agreement of [first] degree murder. What

---

[13]    The People argue that Tinajero forfeited any error regarding the court's response to the jury's questions. Tinajero acknowledges that defense counsel objected neither to the court's response to the jury's questions nor to the court's decision to read CALCRIM No. 3551. However, Tinajero argues that "no objection was required because the court had a sua sponte duty to properly instruct the jury." (See *People v. Loza* (2012) 207 Cal.App.4th 332, 355 [court has a " ' "mandatory" duty to clear up any instructional confusion expressed by the jury.' "].) We need not reach the issue of forfeiture because we determine Tinajero's contentions fail on the merits.

do we do?" The jury also wrote, "Is there a separate verdict form for [second] degree murder?," but that question was crossed out.

The court held a proceeding to address the jury's note, outside of the presence of the jury. The court suggested instructing the jury with CALCRIM No. 3551, the instruction for a deadlocked jury on continuing deliberations, and asking the jury "whether a separate verdict form for second degree murder might help." Both parties agreed with the court's suggestions.

The court then brought the jurors into the courtroom and read CALCRIM No. 3551. The court then asked the jurors, "[M]ight it help if we give you a separate verdict form for second degree murder?" Three jurors raised their hands. The court gave the jury a second verdict form for second degree murder.

The court asked, "Is there anything else that any of you think I can do besides that to help you further?" Juror No. 11 stated, "I thought maybe further instruction as to the agreement of when we're looking at the different counts . . . There is one statement in the jury instructions, . . . it's that everyone must be in agreement . . . that it is guilty or not guilty, they must be in agreement either way for first degree murder. And then if they are in agreement that it is not first degree murder, we can then look at second degree murder." Juror No. 2 then added, "Might I also add, can we get more explicit . . . definitions of first degree murder?"

The court responded, "The definition of first degree murder is in the jury instruction[.] . . . [¶] That instruction . . . has been developed in the law over decades. So that's what the law is and I cannot give you any further instruction about that." The court also advised the jury to "reread and refocus on [CALCRIM No.]

41

640,[14] which talks about what you do when you can or cannot come to an agreement as to each particular count." After hearing no further questions from the jury, the court sent the jurors back to deliberate. On the third day of deliberations, the jury asked for readback of Michael's testimony. The jury reached a verdict the next day.

> 2. *The court adequately responded to the jury's question about its deadlock, and any error in its response to the jury's questions about first degree murder was not prejudicial*

Tinajero contends the court's responses to the jury's questions—regarding its deadlock and the definition of first degree murder—were inadequate.

When a jury asks a question after retiring to deliberate, section 1138 "imposes a 'mandatory' duty [on the trial court] to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212, overruled on other grounds as stated in *In re Steele* (2004) 32 Cal.4th 682, 691; accord, *People v. Loza* (2012) 207 Cal.App.4th 332, 355; § 1138 ["After the jury have retired for deliberation, if . . . they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given."].)

"This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are

---

[14] CALCRIM No. 640 provides instructions for deliberations and completing verdict forms when the jury is given separate jury forms for each level of homicide that is charged.

42

sufficient to satisfy the jury's request for information.  [Citation.]
Indeed, comments diverging from the standard are often risky."
(*People v. Beardslee* (1991) 53 Cal.3d 68, 97; accord, *People v.
Yarbrough* (2008) 169 Cal.App.4th 303, 317 ["section 1138 does
not demand elaboration upon the standard instructions by the
trial court when the jury expresses confusion, but rather directs
the court to 'consider how it can best aid the jury and decide
whether further explanation is desirable, or whether the
reiteration of previously given instructions will suffice' "].)  We
review the trial court's response to a question posed by the jury
for an abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th
690, 745-746.)

The court's response to the jury's question about its
deadlock was not an abuse of discretion.  The jury note asked the
court what to do if the jurors were not "in agreement o[n] [first]
degree murder."  In a similar fashion, Juror No. 11 asked the
court for "further instruction as to the agreement of when we're
looking at the different counts."

The court correctly reasoned that its previous instructions
may have "confused" the jury.  The court had instructed the jury
with CALCRIM No. 640, which told the jury how to consider the
different levels of homicide when the court has given the jury
verdict forms for each level of homicide.  However, the court had
given the jury only one verdict form.

Because CALCRIM No. 640 was "full and complete," the
court did "not abuse its discretion when it determine[d] the best
way to aid the jury [wa]s by directing the jury to reread"
CALCRIM No. 640 and by giving the jury a separate verdict form
for second degree murder.  (See *Lua*, *supra*, 10 Cal.App.5th at
p. 1017 ["[T]he court need not give the jury more information

43

than it asks for."].) This response directly addressed the jury's potential confusion.

It is a closer question whether the court adequately answered the juror's request for "more explicit . . . definitions of first degree murder." When "it [is] clear from the jury's questions that the instruction[] that the court had already given had left the jurors confused, it [is] not enough for the court to inform the jurors, in response to their specific inquiry, that they must rely on the very instruction[] that had confused them." (*People v. Loza*, *supra*, 207 Cal.App.4th at p. 355.) The court did not provide any further definition and merely referred the jury to the given instructions.

As discussed, the first degree murder instruction included extra instructions relevant to a murder by torture charge. Even if the court could have clarified the first degree murder instruction by striking the extraneous instructions relevant to murder by torture, however, "[a] violation of section 1138 does not warrant reversal unless prejudice is shown." (*People v. Beardslee*, *supra*, 53 Cal.3d at p. 97.) A court's failure to adequately respond to the jury's questions is subject to the prejudice standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, that is, whether the error resulted in a reasonable probability of a less favorable outcome. (*Lua*, *supra*, 10 Cal.App.5th at p. 1017.) Here, there is no reasonable probability that the court's failure to provide further clarification of the first degree murder instruction resulted in a less favorable outcome. As discussed, the instruction, viewed as a whole, left no doubt that it adequately instructed the jury regarding the intent to kill requirement. The prosecutor's closing argument further reduced the likelihood of any error. And there is no evidence in the record that the jury

44

continued to express confusion after the court directed it to the first degree murder instruction. Nor is there any evidence that the jury submitted additional questions concerning the issue. (Cf. *People v. Gonzales* (1999) 74 Cal.App.4th 382, 388-389, disapproved on other grounds in *People v. Anderson* (2011) 51 Cal.4th 989, 998, fn. 3 [court erred by reinstructing jury on instructions it had already given where jurors said they remained confused].) As such, Tinajero fails to demonstrate any prejudice.

      3.     *The court properly instructed the jury with CALCRIM No. 3551*

Tinajero argues CALCRIM No. 3551[15] is "coercive" and an improper "*Allen*-type instruction." We disagree.

---

[15] CALCRIM No. 3551 states: "Sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict [on one or more counts]. Please consider the following suggestions. Do not hesitate to reexamine your own views. Fair and effective jury deliberations require a frank and forthright exchange of views. Each of you must decide the case for yourself and form your individual opinion after you have fully and completely considered all of the evidence with your fellow jurors. It is your duty as jurors to deliberate with the goal of reaching a verdict if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or others want to reach a verdict. Both the People and the Defendant are entitled to the individual judgment of each juror. It is up to you to decide how to conduct your deliberations. You may want to consider new approaches in order to get a fresh perspective. Let me know whether I can do anything to help you further, such as give additional instructions or clarify instructions I have already given you. Please continue your deliberations at this time. If you wish to communicate with me further, please do so in writing."

The California Supreme Court in *People v. Gainer* (1977) 19 Cal.3d 835 (*Gainer*), disapproved on another point in *People v. Valdez* (2012) 55 Cal.4th 82, 163, prohibited a jury instruction, commonly referred to as an " 'Allen charge.' " (*Id.* at p. 842.) The court identified two features of the Allen charge that were improper. (*Id.* at p. 845.)

"The first and most questionable feature [was] the discriminatory admonition directed to minority jurors to rethink their position to light of the majority's views." (*Gainer*, *supra*, 19 Cal.3d at p. 845.) This concept was articulated in the following passage: " '[I]f much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority.' " (*Ibid.*) The court held this feature was improper because it "encourage[d] jurors to consider the numerical division or preponderance of opinion on the jury in forming or reexamining their views on the issues before them." (*Id.* at p. 852.)

The second questionable feature was the instruction, " 'You should consider that the case must at some time be decided.' " (*Gainer*, *supra*, 19 Cal.3d at p. 845.) The court held this second feature was improper because it "state[d] or implie[d] that if the jury fails to agree the case will necessarily be retried." (*Id.* at p. 852.)

Tinajero contends that CALCRIM No. 3551 as given contained defects equivalent to those two defects identified in

46

*Gainer*. Tinajero asserts the sentence in CALCRIM No. 3551, "Do not hesitate to reexamine your own views," was equivalent to instructing the jury that " 'a dissenting juror should consider whether his doubt was a reasonable one,' " the phrase disapproved of in *Gainer*, *supra*, 19 Cal.3d at page 845. *Gainer* disapproved that instruction because it was directed only to dissenting jurors, which "constitutes just such excessive pressure on the dissenting jurors to acquiesce in a verdict." (*Id*. p. 850.) It also "pointedly direct[ed] the [dissenting] jurors to include an extraneous factor in their deliberations, i.e., the position of the majority of jurors at the moment." (*Id*. at p. 848.)

There was no such similar flaw here. The sentence in CALCRIM No. 3551, "Do not hesitate to reexamine your own views," was directed to *all* jurors. (See *People v. Valdez*, *supra*, 55 Cal.4th at p. 162 [instruction that encouraged members of *both* the majority and the minority to " 'reweigh [their] positions' " was not coercive]; *People v. Moore* (2002) 96 Cal.App.4th 1105, 1118, 1121 (*Moore*) [court's instruction "you should not hesitate to re-examine your own views or to request your fellow jurors to re-examine theirs" was not coercive].) Moreover, other sentences in CALCRIM No. 3551 eliminated any potential coercion. The instruction told the jurors: "It is your duty as jurors to deliberate with the goal of reaching a verdict, if you can do so without surrendering your individual judgment. Do not change your position just because it differs from that of other jurors or just because you or other jurors want to reach a verdict." (CALCRIM No. 3551.)

Tinajero also asserts the phrase "[i]t is your duty as jurors to deliberate with the goal of reaching a verdict" is "similar to the disapproved *Gainer* instruction telling the jury that they 'should

47

consider that the case must sometime be decided.' "  As discussed, *Gainer* disapproved of this instruction because of "its attendant implication that a mistrial will inevitably result in a retrial." (*Gainer*, *supra*, 19 Cal.3d at p. 851.)  Unlike the Allen charge in *Gainer*, nothing in CALCRIM No. 3551 stated or implied that if the jury failed to agree, the case would necessarily be retried "at some time" in the future.  (See *Moore*, *supra*, 96 Cal.App.4th at p. 1121 [instruction to jury that the " 'goal as jurors should be to reach a fair and impartial verdict . . . simply reminded the jurors of their duty to attempt to reach an accommodation"].)

Tinajero lastly asserts that the phrases in CALCRIM No. 3551 that "[i]t is your duty as jurors to deliberate with the goal of reaching a verdict" and "sometimes juries that have had difficulty reaching a verdict are able to resume deliberations and successfully reach a verdict" impermissibly suggest "it is preferable to reach a verdict, and a hung jury is a failure."  While it is true "[c]oercion occurs where 'the trial court, by insisting on further deliberations, expresse[s] an opinion that a verdict should be reached' " (*People v. Peoples* (2016) 62 Cal.4th 718, 783), that is not what happened here.  (See *People v. Virgil* (2011) 51 Cal.4th 1210, 1281-1282 [it was not coercive to instruct jury that it "must make every effort to reach [a] unanimous [verdict] if at all possible" in response to a jury question about what would happen if it was unable to reach a unanimous verdict]; *Moore*, *supra*, 96 Cal.App.4th at pp. 1118, 1121 [instruction to jury " 'It has been my experience on more than one occasion that a jury which initially reported it was unable to reach a verdict was ultimately able to arrive at verdicts on one or more of the counts before it' " did not direct jury that it was required to reach a verdict].)

Also, Tinajero ignores the language that comes after one of the challenged phrases, which demonstrates the instruction is not impermissibly coercive. CALCRIM No. 3551 states, "It is your duty as jurors to deliberate with the goal of reaching a verdict *if you can do so without surrendering your individual judgment*." (Italics added.) This does not say or imply that the case *must* be decided. The court here also explicitly instructed the jury, "Do not change your position just because it differs from that of other jurors or just *because you or others want to reach a verdict*." (Italics added.) Therefore, CALCRIM No. 3551 was not coercive, and the trial court did not err in giving the instruction.

D.    *Cumulative Effect of the Errors*

Tinajero argues the cumulative effect of the claimed errors was prejudicial and deprived him of a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "To the extent that there are a few instances in which we found or assumed the existence of error, we concluded that no prejudice resulted. We reach the same conclusion after considering the errors' cumulative effect." (*People v. Booker* (2011) 51 Cal.4th 141, 195.)

E.    *Sentencing*

Tinajero contends the court abused its discretion by sentencing Tinajero to 25 years to life for the firearm enhancement because the court did not consider the applicable circumstances in mitigation, such as Tinajero's age, and the aggravating circumstances the court did consider were not supported by the evidence. Recognizing the likely forfeiture of

49

this claim, Tinajero alternatively contends that defense counsel provided ineffective assistance of counsel by not arguing for any sentencing leniency.  We agree counsel's performance was deficient, but we conclude Tinajero failed to establish prejudice.

1.    *The court has discretion to strike a section 12022.53, subdivision (d), firearm enhancement*

Section 12022.53, subdivision (d), provides in relevant part, "[A] person who, in the commission of [murder], personally and intentionally discharges a firearm and proximately causes . . . death . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life." (§ 12022.53, subd. (d).)  As of January 1, 2018, pursuant to Senate Bill No. 620 (2017-2018 Reg. Sess.), "[t]he court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."  (§ 12022.53, subd. (h); see *Nazir v. Superior Court* (2022) 79 Cal.App.5th 478, 496.)  A trial court has discretion to strike a section 12022.53, subdivision (d), enhancement entirely, or to impose a lesser firearm enhancement.  (*People v. Tirado* (2022) 12 Cal.5th 688, 692.)

"In 2021, the Legislature enacted Senate Bill No. 81 (2021-2022 Reg. Sess.) . . . , which amended section 1385 to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice.  (Stats. 2021, ch. 721, § 1.)" (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)  Subdivision (c)(1) of section 1385 as amended provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is

prohibited by any initiative statute."[16]  "In determining whether to dismiss a firearm enhancement under section . . . 12022.53, a court considers the same factors considered ' "when handing down a sentence in the first instance." ' [Citations.]  These factors include those listed in California Rules of Court . . . rules 4.421 and 4.423 (circumstances in aggravation and mitigation)." (*Nazir v. Superior Court*, *supra*, 79 Cal.App.5th at p. 497; see *People v. Parra Martinez* (2022) 78 Cal.App.5th 317, 321.) Effective March 14, 2022, the list of mitigating circumstances in rule 4.423 of the California Rules of Court (Rule 4.423) was amended to add that "[t]he defendant . . . was under 26 years of age at the time of the commission of the offense." (Rule 4.423(b)(6).)

"[U]nless the record affirmatively reflects otherwise," the court is deemed to have considered the factors enumerated in the rules.  (Cal. Rules of Court, rule 4.409; see *People v. Pearson* (2019) 38 Cal.App.5th 112, 117; Evid. Code, § 664 [presumption that official duty has been regularly performed].)

2.    *Relevant background*

The probation report, prepared before Rule 4.423 was amended to include youth as a mitigating factor, provided there were no mitigating factors, although it did list Tinajero's age. The prosecutor filed a memorandum stating, "There are no mitigating circumstances either in [Tinajero's] criminal history, the facts of this case, or how they were committed" that

---

[16]    The Legislature also added subdivision (c)(2) to section 1385, listing particular mitigating circumstances entitled to great weight in favor of dismissing an enhancement (i.e., "super mitigants"—see footnote 23, *infra*).  None of those particular mitigating factors is implicated here.

51

warranted striking the gun enhancement. The prosecution argued the court should impose a sentence of 50 years to life on the murder count, including 25 years to life for the murder, plus 25 years to life for the section 12022.53, subdivision (d), firearm enhancement. Defense counsel did not file a sentencing memorandum.

At the sentencing hearing, the court said it had read and considered "the probation report [and] the People's sentencing position." The court asked defense counsel for his position, and defense counsel replied, "Your Honor, I'll submit. I know these are prescribed by law and there's nothing really much I can say. . . . [A]ll around this is just a really, really sad situation and there are no winners."

The court found the following circumstances in aggravation: (1) the crime involved great violence and great bodily harm; (2) the crime involved a high degree of cruelty, viciousness, and callousness; (3) the manner in which the crime was carried out indicated planning, sophistication and professionalism; (4) Tinajero engaged in violent conduct indicating he was a serious danger to society; and (5) Tinajero's prior convictions and sustained petitions in juvenile delinquency demonstrated an increased seriousness. The court stated, "I find no circumstances in mitigation with regard to the defendant in terms of the crime or factors relating to the defendant." Before pronouncing the sentence of 25 years to life for the murder, it stated, "This case involved a gang hit carried out on a public street in the middle of the day, needless to say that anyone might have been on the street or anyone who lived in any of those houses on the street were placed in danger, as well as, of course, the victim."

Before imposing the 25-years-to-life term for the 12022.53, subdivision (d), firearm enhancement, the court stated, "I do exercise my discretion and refuse to strike the section 12022.53[, subdivision] (d) allegation, based on these findings and the seriousness of the offense."  The court found Tinajero had committed "a cold-blooded execution gang murder."

As to the possession of a firearm count, the court imposed two years (the middle term, which was the maximum allowable without jury findings of aggravating circumstances).  The court adopted the People's recommendation not to run this term consecutively.  Defense counsel did not object at any point.

3.    *Forfeiture*

Tinajero contends the court abused its discretion by sentencing Tinajero to 25 years to life for the firearm enhancement because the court did not consider the applicable circumstances in mitigation, such as Tinajero's age, and the aggravating circumstances the court did consider were not supported by the evidence.  However, Tinajero did not raise either of these arguments at sentencing; instead, defense counsel "submit[ted]."  Tinajero's failure to raise these issues at sentencing forfeited his contentions.  (See *People v. Boyce* (2014) 59 Cal.4th 672, 730 [" 'complaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal' "]; *In re Sheena K.* (2007) 40 Cal.4th 875, 881 ["[T]he forfeiture rule applies in the context of sentencing as in other areas of criminal law.  As a general rule neither party may initiate on appeal a claim that the trial court failed to make or

articulate a ' "discretionary sentencing choice[ ]" ' "]; accord, *People v. Scott* (1994) 9 Cal.4th 331, 356 (*Scott*).)[17]

  4.  *Ineffective assistance of counsel*

Tinajero alternatively argues his counsel's failure to advise the court of the circumstances in mitigation and to challenge the court's findings regarding the circumstances in aggravation constituted ineffective assistance of counsel.  A "defense attorney who fails to adequately understand the available sentencing alternatives, promote their proper application, or pursue the most advantageous disposition for his client may be found incompetent." (*Scott*, *supra*, 9 Cal.4th at p. 351.)  Counsel has a duty "to be certain that the sentence imposed is based on complete and accurate information." (*People v. Cotton* (1991) 230 Cal.App.3d 1072, 1085-1086.)

Tinajero's age of 22 years at the time of the commission of the offenses constituted a circumstance in mitigation under Rule 4.423(b)(6), a factor the court was required to weigh in

---

[17]  Tinajero contends there is no forfeiture because he "challenges the court's apparent misapprehension of the relevant case law and rules of court and its statutory sentencing obligations."  While Tinajero is correct that certain types of legal errors at sentencing may be raised on appeal notwithstanding the absence of objection in the trial court, the cases declining to find forfeiture are generally those in which the error resulted in an unauthorized sentence.  (See *In re Sheena K.*, *supra*, 40 Cal.4th at p. 887.)  The errors identified by Tinajero do not fall within that limited category.  (See *Scott*, *supra*, 9 Cal.4th at p. 356 fn. 18 ["defects in the court's discretionary sentencing choices . . . do not result in an 'unauthorized sentence' "].)

determining whether to strike the enhancement.[18] (See *Nazir v. Superior Court*, *supra*, 79 Cal.App.5th at p. 497; § 1385(c)(2).) Likely based on the outdated probation report and the prosecution's sentencing memorandum, and without any input to the contrary from defense counsel, the court erroneously stated there were "no circumstances in mitigation," and it appears the court did not count Tinajero's youth as a mitigation factor as it should have in exercising its discretion whether to strike the enhancement. Nor did the court reference Tinajero's youth during other points of the sentencing. Given defense counsel's statements that the sentence recommended by the prosecution (25 years to life each for the first degree murder and the enhancement) was "prescribed by law" and there was "nothing" he could argue, it appears defense counsel was not aware of the recent changes in the law effective March 2022 making Tinajero's youth a mitigating factor, or possibly the changes in the law effective 2018 giving the court discretion to strike the firearm enhancement.

Based on this record, we cannot presume counsel had a tactical reason for not requesting the court exercise its discretion

---

[18] Tinajero asserts his "insignificant criminal record" and the fact that he committed the offenses "under duress" were other mitigating circumstances that defense counsel should have argued at sentencing. (See Cal. Rules of Court, rule 4.423(a)(4), (b)(1).) However, there is no support in the record for those circumstances. As the court correctly noted during sentencing, Tinajero had prior convictions and sustained juvenile delinquency petitions that were of increasing seriousness. Moreover, as discussed, there was no evidence Tinajero acted under duress when he committed the instant offenses. Thus, any argument as to those two factors would have been frivolous.

to strike the enhancement.[19]  (Cf. *People v. Mickel*, *supra*, 2 Cal.5th at p. 198 [defendant generally bears burden on appeal to show counsel had no rational tactical purpose for an omission to prevail on an ineffective assistance claim].)  Under these circumstances, defense counsel's failure to ask the court to exercise its discretion to strike the enhancement constituted deficient performance.  (See *People v. Scott*, *supra*, 9 Cal.4th at p. 351.)

Nonetheless, we conclude counsel's failure to ask the court to strike the enhancement because of Tinajero's relatively young age did not prejudice Tinajero.  As discussed, to demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  (*Strickland*, *supra*, 466 U.S. at p. 694; accord, *People v. Centeno* (2014) 60 Cal.4th 659, 676.)  "It is not enough . . . to propose that counsel's performance had some 'conceivable effect' on the outcome. . . .  Prejudice must be a demonstrable reality established based on facts in the record, not simply speculation as to the effect of the errors or omissions of counsel."  (*People v. Tilley* (2023) 92 Cal.App.5th 772, 778; accord, *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1147.)

Tinajero points to no facts in the record to meet his burden to demonstrate it is reasonably probable the trial court would have struck or reduced the 20-year firearm enhancement "in the

---

[19]    We reach the opposite conclusion as to defense counsel's failure to object to the court's findings regarding the circumstances in aggravation.  Such an objection would have been frivolous because there was ample evidence supporting the court's findings.

interest of justice" had it identified and weighed the youth mitigation factor under Rule 4.423(b)(6). The record suggests the contrary is true. In deciding not to exercise its discretion to strike the enhancement, the court relied on five circumstances in aggravation, as well as the seriousness of the offense, the danger to anyone in the vicinity from Tinajero's "gang hit carried out on a public street in the middle of the day," and the fact that Tinajero had committed a "cold-blooded execution gang murder."

Moreover, Tinajero's youth was not a " 'super mitigant' "[20] (*People v. Morgan* (2024) 103 Cal.App.5th 488, 515, review granted), as it would be for sentencing under section 1170, subdivision (b)(6)(B), which creates a presumption that the trial court should impose lower term for a determinate sentence when the offender is under 26 years old. Rather, it is one of 25 ordinary mitigating factors relating to the crime and the defendant that the trial court is supposed to consider (but which are not entitled to any particular weight) in determining if it would be "in the interest of justice" to strike the firearm

---

[20] "A 'super mitigant' is a 'mitigating factor enumerated in . . . 1170(b)(6) that, if established as a contributing factor to the commission of the offense, limits the court to imposition of the low term of imprisonment, unless the court finds the aggravating circumstances outweigh the mitigating circumstances so that imposition of the low term would be contrary to the interests of justice' or 'a mitigating factor enumerated in . . . 1385(c)(2) that requires or weighs greatly in favor of the court dismissing or striking any additional punishment for conduct and status enhancements unless the court finds there is a likelihood that dismissal would result in physical injury or serious danger to others.' " (*People v. Morgan* (2024) 103 Cal.App.5th 488, 515, fn. 13, review granted, Oct. 2, 2024, S286493.)

enhancement.  (§ 12022.53, subd. (h); Cal. Rules of Court, rules 4.423, 4.409.)  Given the countervailing aggravating circumstances and the court's characterization of the brazenness of this gang "execution" by Tinajero, it would strain credulity to conclude the court might have reached a different conclusion on the enhancement merely based on one mitigating circumstance—Tinajero's age of 22 at the time of the murder.

Tinajero has not met his burden to show a reasonable probability of a different result had defense counsel alerted the court to the youth mitigation factor under Rule 4.423(b)(6).  As such, his claim of ineffective assistance of counsel as to Tinajero's sentencing fails.

## DISPOSITION

The judgment is affirmed.

STONE, J.

We concur:

MARTINEZ, P. J.

PULOS, J.*

---

\* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.